1  SUSAN K. GAREA, SBN 260407
**BEESON, TAYER & BODINE, APC**
2  483 Ninth Street, 2nd Floor
3  Oakland, CA  94607-4051
Telephone: (510) 625-9700
4  Facsimile:  (510) 625-8275
Email:       sgarea@beesontayer.com
5
6  Attorneys for Plaintiff
PACIFIC MEDIA WORKERS GUILD, CWA LOCAL 39521
7
8              **UNITED STATES DISTRICT COURT**
9           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11  PACIFIC MEDIA WORKERS GUILD,<br>CWA LOCAL 39521, | Case No. |
| 12 | **COMPLAINT TO COMPEL ARBITRATION** |
|               Plaintiff, | **OR, IN THE ALTERNATIVE, COMPLAINT** |
| 13 | **FOR BREACH OF COLLECTIVE** |
|      v. | **BARGAINING AGREEMENT** |
| 14 | |
| 15  SAN FRANCISCO CHRONICLE, a division<br>of HEARST COMMUNICATIONS, INC., | [29 U.S.C. § 185] |
| 16 | |
|               Defendant. | |

17

18          For its Complaint in the above-captioned case, Plaintiff alleges as follows:

19          1.     This action is brought pursuant to Section 301 of the Labor Management Relations Act

20  (LMRA), codified as 29 U.S.C. Section 185, and seeks enforcement of the terms of a collective

21  bargaining agreement.

22          2.     Plaintiff, Pacific Media Workers Guild, CWA Local 39521 (hereinafter, the "Union")

23  and Defendant, the San Francisco Chronicle (hereinafter, the "Employer" or the "Chronicle") are

24  parties to a collective bargaining agreement (hereinafter the "Agreement") establishing the terms and

25  conditions of employment for covered employees, as well as providing for arbitration of disputes

26  arising between them that arise under the Agreement.  By this Complaint, the Union seeks to enforce

27  the terms of the Agreement that are the subject of two grievances, described below, or, in the

28  alternative, to obtain an order compelling arbitration of said grievances.

1

## JURISDICTION

3.  Defendant's business operations affect interstate commerce within the meaning of the National Labor Relations Act, 29 U.S.C. Sections 142(1), 152(6) and (7), and Section 301 of the LMRA, 29 U.S.C. Section 185.

4.  Plaintiff is a Labor Organization as defined under Sections 142(3) and 152(5) of Title 29 of the United States Code.

5.  Defendant is an Employer as defined by Sections 142(3) and 152(2) of Title 29 of the United States Code.

6.  During the events in this case, Defendant and Plaintiff were parties to a written collective bargaining agreement covering Employees, as the term is defined by the LMRA, 29 U.S.C. Section 152(3).

7.  The Court has subject matter jurisdiction in this proceeding under LMRA Section 301, 29 U.S.C. Section 185, which provides that "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

## VENUE (INTRADISTRICT ASSIGNMENT)

8.  Pursuant to LMRA Section 301(c)(1), 29 U.S.C. Section 185(c)(1), venue is proper in the Federal Judicial District of the Northern District of California because:  Plaintiff is headquartered in the City and County of San Francisco, California;  the collective bargaining agreement between Plaintiff and Defendant was executed in, and governs the terms and conditions of employment for employees represented by Plaintiff and working in this judicial district;  the acts and/or omissions alleged herein arose in the County of San Francisco;  and Defendant's principal place of business is in San Francisco, California.

9.  As this action arose in the County of San Francisco, pursuant to Local Rules 3-2(c) and 3-2(d), assignment to the District's San Francisco or Oakland division is appropriate.

//

**COMPLAINT TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, COMPLAINT FOR BREACH OF COLLECTIVE BARGAINING AGREEMENT**
Case No.

691492.docx

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CLAIM FOR RELIEF

10.   The Union and the Employer are parties to a written collective bargaining agreement (the "Agreement") covering certain classifications of the Employer's employees.  A copy of the Agreement is attached hereto as "**Exhibit A**."  Said Agreement has been in full force and effect at all times material to this Complaint.

### *The Vacation Removal Grievance*

11.   Article XII of the Agreement provides for vacation accrual at specified rates. It further provides that vacation must be taken in the year in which it is earned "or else it will be forfeited unless a manager or supervisor in the applicable department permits an Employee to carry over time." For years the Chronicle allowed employees to carry over time.

12.   In 2016, the Chronicle threatened that it would "zero out" employees' vacation that was not taken by the end of the year *without* cashing out employees at the start of 2017. The Chronicle has never before taken away employees' earned vacation.

13.   The Agreement is silent as to the forfeiture of *pay* for earned vacation. The Union has never agreed that forfeiting the right to use earned vacation constituted forfeiture of the right to receive pay for the earned vacation. The parties have never applied this provision to operate as a waiver of vacation pay. When the provision was negotiated in 2009, there was no discussion or statement from the Chronicle that it intended the provision to operate as a waiver of employees' right to accrued but unused vacation pay.

14.   The Chronicle's interpretation violates California state law that holds that earned vacation is a vested right that cannot be forfeited. The Chronicle's interpretation converts its vacation policy into an unlawful "use it or lose it" policy.

15.   The Chronicle's interpretation creates the absurd result whereby an employee who quits on December 31 is entitled to be cashed out for all earned but untaken vacation, but an employee who continues to work loses all earned vacation pay.

16.   In 2016, the Guild attempted to resolve the issue prior to the Chronicle breaching the Agreement and zeroing out vacation balances without compensation. Thus the parties discussed the issue.  On information and belief, at the start of 2017 the Chronicle deleted certain bargaining unit

3

**COMPLAINT TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, COMPLAINT FOR BREACH OF COLLECTIVE BARGAINING AGREEMENT**
Case No.

691492.docx

1    employees' vacation balances without paying employees for earned vacation. The Union

2    investigated this issue and made a request for information to determine if there were any affected

3    members.

4            17.    On January 24, 2017, the Chronicle provided a response to the Union's information

5    request which reflected that 124 members had some amount of vacation time deleted from their

6    accounts without any compensation. Upon determining that it had affected members, the Guild filed a

7    grievance on February 11, 2017. A copy of the grievance is attached hereto as **Exhibit B**. The

8    Employer denied the grievance, leading the Union to forward the dispute to arbitration, pursuant to

9    Article VI(c) of the Agreement. On April 11, 2017, the Union forwarded the grievance to arbitration.

10   A copy of the email whereby the Union forwarded the email to arbitration is attached hereto as

11   **Exhibit C**.

12           18.    For the first time at the beginning of 2017 the Chronicle took away earned vacation

13   from unit members without compensation. This contract provision had never been applied as a

14   waiver of employees' right to vacation pay for accrued vacation. Thus arose the parties' dispute

15   about the meaning of the contract provision and the Union filed a grievance. The Guild's grievance

16   was timely filed, within 21 days of receipt of information establishing that the Chronicle had deleted

17   employees' vacation without compensation in violation of the Agreement. Moreover, by Agreement

18   and governing law any issue of procedural arbitrability is for an arbitrator to determine.[1]

19           19.    On April 19, 2017, the Chronicle refused to arbitrate this matter stating that the

20   grievance was "frivolous" and was not an attempt to "vindicate a contractual right." A copy of this

21   letter is attached hereto as **Exhibit D**.

22

---

23   [1] Procedural arbitrability concerns such issues as "whether grievance procedures or some part of them apply to a
     particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow

24   them avoids the duty to arbitrate." *John Wiley & Sons v. Livingston*, 376 U.S. 543, 557 (1964). The Court held in *Wiley*
     that because procedural questions are often inextricably bound up with the merits of the dispute, they should also be

25   decided by the arbitrator and the adjudication of procedural questions by the courts would needlessly delay the resolution
     of the dispute. Thus the court's role is limited to determining whether the parties submitted the "subject matter" of a

26   particular dispute to arbitration. If so, then any attendant procedural issues are for the arbitrator as well. *Id*. at 557. The
     Supreme Court and various Circuit Courts have reaffirmed this foundational principle. *See, e.g., Howsam v. Dean Witter*

27   *Reynolds Inc.*, 537 U.S. 79, 84 (2002) (procedural questions, such as whether a contractual grievance procedure has been
     followed, or the effect of waiver or delay, are "presumptively not for the judge, but for an arbitrator, to decide.") The

28   arbitration clause in the Agreement does not exclude procedural  matters from arbitration and, therefore, any such
     procedural dispute is properly before the arbitrator along with the merits.                                    4

**COMPLAINT TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, COMPLAINT**          691492.docx
**FOR BREACH OF COLLECTIVE BARGAINING AGREEMENT**
Case No.

20.   Article VI of the Agreement contains a "Grievance and Arbitration Procedure" that applies broadly to "all grievances arising under this Agreement." (*See*, Exh. A, attached hereto, Art. VI(a).)  This provision subjects all grievances over disciplinary matters to arbitration, but limits the arbitration of contract interpretation disputes to the parties' mutual agreement, while mandating that "such agreement [is] not to be unreasonably withheld."  In bargaining, the parties specifically agreed that this limitation was intended to be narrow and to reach only disputes that were wholly frivolous.  In any event, the Employer specifically agreed that it was an arbitrator's province to determine the arbitrability of disputes between the parties.

21.   Within the six months prior to the filing of this Complaint, the Employer refused to submit the dispute to arbitration.  Said refusal continues to date.

22.   The Employer's refusal to participate in an arbitration proceeding regarding the above-referenced dispute violates the collective bargaining agreement between the parties.

23.   Moreover, the Employer's taking of employees' earned vacation without cashing them out violates the collective bargaining agreement between the parties.

### *The Temporary Employees' Vacation Grievance*

24.   The Agreement covers "Temporary Employees." Article XVIII defines temporary employees and states that "Temporary Employees, including On-Call Employees, shall be subject to the provisions of this Agreement except as otherwise provided herein. Temporary Employees, including On-Call Employees, shall not be eligible to receive any severance payments or benefits for layoffs or termination of employment." *See* Exhibit A, Article XVIII.

25.   The Agreement specifies that Temporary Employees are entitled to all benefits of the Agreement except those from which they are explicitly excluded. Article XVIII expressly excludes Temporary Employees from severance benefits or other benefits for layoff or termination, such as provision of continued health benefits. The Agreement does not exclude Temporary Employees from vacation benefits, which accrue as employees work.

26.   In the past, Temporary Employees have earned and been paid out vacation benefits under the Agreement.

27.   At a date unknown to the Union, the Chronicle ceased accruing vacation to certain

**COMPLAINT TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, COMPLAINT FOR BREACH OF COLLECTIVE BARGAINING AGREEMENT**
Case No.

691492.docx

Temporary Employees and began breaching the Agreement by failing and refusing to accrue vacation to on-call copy editors.

28.   On September 11, 2017, the Union filed a grievance.  A copy of the grievance is attached hereto as **Exhibit E**. The Chronicle responded denying the grievance, refusing to arbitrate the grievance and stating that arbitration is unavailable. A copy of the refusal is attached hereto as **Exhibit F**.

29.   The Employer's refusal to arbitrate appears to be based on its claim that the grievance was untimely as it has not asserted that the grievance is frivolous and could not establish such a claim as the clear contract language and past practice establish that Temporary Employees are entitled to vacation.

30.   The timeliness question is for an arbitrator and must be arbitrated.  The grievance was timely filed after investigation and attempts to resolve culminating in the Employer's refusal to correct its breach.  Further, it is clear that there is no timeliness issue as the refusal to pay vacation as required under the Agreement is an ongoing violation.[2]

31.   Within the six months prior to the filing of this Complaint, the Employer refused to submit the dispute to arbitration.  Said refusal continues to date.

32.   The Employer's refusal to participate in an arbitration proceeding regarding the above-referenced dispute violates the collective bargaining agreement between the parties.

33.   Moreover, the Employer's failure and refusal to accrue vacation benefits to on-call copy editors violates the Agreement between the parties.

34.   The Employer's violations, as herein alleged, deprive the Union and its members, of the benefits of the Agreement between the parties and works continuing, irreparable harm on the ability of the Union to provide proper representation to its members.  There is no adequate remedy at law for

---

[2] The question of procedural arbitrability is one for the arbitrator to decide. *See supra Wiley*. There is ample arbitrable authority, enforced by the Courts for applying a continuing violation theory in this situation. *See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union AFL–CIO–CLC v. Wise Alloys, LLC*, 807 F.3d 1258, 1272–73 (11th Cir. 2015) (affirming application of the continuing violation doctrine where violation was company's failure to deduct a cost-of-living allowance from a weekly health-care premium); *Nat'l Postal Mail Handlers Union*, 589 F.3d at 439–44 (affirming arbitrator's interpretation of agreement to "incorporate a 'continuing violations' theory under which" he could hear disputes about pre–1992 work assignments that continued after 1992 even though agreement banned new disputes regarding pre–1992 work assignments).

6

**COMPLAINT TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, COMPLAINT FOR BREACH OF COLLECTIVE BARGAINING AGREEMENT**
Case No.

said violation, and injunctive relief is appropriate.

35.   There is no arguable legal defense in support of the Employer's position, as aforesaid. The Employer's position defeats both the purpose of the Agreement between the parties, and the policy of federal labor law favoring arbitration of such disputes. The Chronicle has continued to refuse to arbitrate grievances under this Agreement despite a recent order to arbitrate another grievance in Case No. 17-CV-00172-WHO.  The legal issue is identical yet the Chronicle persists in its refusal to arbitrate grievances. The Chronicle's continued refusal despite the recent order of this Court reflects a lack of good faith or reasonableness and warrants an award of attorneys' fees. *See Local 285 v, Nonotuck Resources Associates, Inc.*, 64 F.3d 735 (1st Cir. 1995) (holding district court abused its discretion in failing to award attorneys' fees where employer refused to arbitrate a grievance based on its claim that it was procedurally deficient and failed to distinguish *Wiley*). Accordingly, an award of attorney's fees incurred by Plaintiff in bringing this action is appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, it is respectfully prayed that this Court assume jurisdiction, and following hearing, issue its Order:

1.   Directing Defendant to reimburse Plaintiff for its court costs and reasonable attorneys' fees incurred in pursuing this Complaint; and

2.   Compelling Defendant to participate in arbitration of the Grievance and the issues raised therein in the manner provided for in the parties' Agreement; or, in the Alternative,

3.   Compelling Defendant to pay out employees for the amount of vacation time removed from employees' after 2016 as required by the parties' Agreement; and in all events,

4.   Granting such other relief as the Court in its discretion deems just and equitable.

Dated:  October 17, 2017

BEESON, TAYER & BODINE, APC


By:     */s/ Susan K. Garea*
SUSAN K. GAREA
Attorneys for Plaintiff PACIFIC MEDIA
WORKERS GUILD, CWA LOCAL 39521

COMPLAINT TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, COMPLAINT
FOR BREACH OF COLLECTIVE BARGAINING AGREEMENT
Case No.

691492.docx

**EXHIBIT A**

AGREEMENT

between the

PACIFIC MEDIA WORKERS GUILD
LOCAL 39521, TNG-CWA, AFL-CIO, CLC

and

THE SAN FRANCISCO CHRONICLE, a division of Hearst Communications, Inc.

Effective: July 1, 2012; Terminating: June 30, 2017

---

This Agreement is made this 1st day of July 2012, by and between The San Francisco Chronicle, a division of Hearst Communications, Inc., hereinafter referred to as the "Employer," and the Pacific Media Workers Guild, Local 39521, TNG-CWA, AFL-CIO, CLC, hereinafter referred to as the "GUILD," for itself and on behalf of its members as referenced herein.

WITNESSETH

In consideration of the mutual covenants herein contained, the parties hereto agree as follows:

## ARTICLE I   COVERAGE

(a)   All of the conditions and benefits contained in this Agreement shall apply to all Employees who now or hereafter during the term of this Agreement are employed in the job classifications set forth herein in Articles XX and XXI (hereinafter referred to as "Employees.")

(b)   The jurisdiction of the Guild is:

(1)   The kind of work which is customarily or presently performed by Employees within the unit as described in (a) above; and

(2)   Any other kind of work assigned to be performed within said unit.

Performances of any of the foregoing work, whether by presently or customarily used processes or equipment or by new or modified processes or equipment, shall be assigned to Employees.

(c)   Notwithstanding any other provision of this Agreement to the contrary, the Employer may assign and/or subcontract any work within the jurisdiction of the Guild to any other employees, persons or entities including but not limited to stringers, freelancers and

employees not covered by this Agreement.  There shall be no restriction on the Employer's right to obtain print or electronic content, including but not limited to syndicated material.  Without limiting the generality of the foregoing, the parties agree that the following positions and functions are not within the bargaining unit or jurisdiction of the Guild:

1.  All executive officers, vice presidents, directors, as well as all managerial and supervisory positions;

2.  All secretaries, administrative assistants, executive assistants and paralegals working for persons described in 1 above; and

3.  All positions within the Human Resources Department, including Health & Safety and Labor Relations, and the following positions (whenever the singular is used, the plural shall be included):

Advertising:

Advertising Applications & Information Manager
Automotive Sales Director
Channel Manager
Classified Call Center Supervisor
Data Warehouse Manager
Digital Manager National/Key Accounts
Digital Manager Local
Finance Reporting and Systems Supervisor
Key Accounts Manager
Multi-Media Sales Manager
Multi-Media Sales Analyst

National Advertising Sales Manager
Promotions and Event Manager
Real Estate Director
Real Estate Manager
Retail Ad Director
Retail Sales Manager
Advertising Operations Director
Strategic Development Director
Telesales Manager
Trainer/Custom Pubs Specialist

Editorial:

Administration/Operations
Administrative Assistant
Art Director
Arts and Entertainment Editor
Assistant Business Editor
Assistant Managing Editor
Assistant Sports Editor
Book Editor
Business Editor
Copy Desk Chief
Copy Desk Chief/Sports
Deputy Art Director
Deputy Editor

Features Editor
Food Editor
Foreign/National Editor
Foreign/National Weekend Deputy Editor
Home and Garden Editor
iPad Producer
Library Director
Managing Editor
Metro Editor
National Editor
Night Editor
Photo Director

Deputy Editorial Page Editor
Deputy Metro Editor
Deputy Sports Editor
Deputy Photo Director
Editor 96 Hours
Editorial Page Editor
Executive Food and Wine Editor
Executive Features Editor
Features Editor

Photo Editor
Senior Art Director
Senior Copy Desk Chief Senior
Sports Editor
Style Editor
Sunday Datebook Editor
Sunday Editor
Travel Editor
Topics Editor
Wine Editor

Finance:

Assistant Payroll Manager
Assistant Resident Controller
Cash Services Supervisor
Cashier Supervisor
Financial Analyst
Finance Director
Financial Planning Director
General Ledger Analyst
Manager Fin. Regulatory Affairs

Payroll Manager
Project Manager
Resident Controller
Revenue Accounting
  Supervisor
Senior Advertising Revenue Analyst
Senior Accounting Manager
Senior Financial Analyst
U.S. Mailroom/Tearsheet Supervisor

Marketing:

Administrator Budget/Media Planner
Business Marketing Director
Consumer Marketing Director
Custom Publication Manager

Marketing Communications
Manager
Marketing Operations Manager

Production:  All positions within the Production Department except the Prepress
Department and within the Prepress Department the following positions are exempt:

Ad Layout Supervisor
Ad Services Manager
Electronic Ad Makeup
Manager
Imaging and Coloring Manager

Page Production Manager
Pagination Systems
Manager
Production Coordinator
and Quality Manager
Special Publications Manager

Circulation:  All positions within the Circulation Department except:

Bookkeeper
Dispatcher Router

Intermediate Clerk B
Processing Coordinator

3

| | |
|---|---|
| Collector | Reconciliation Fulfillment |
| Customer Relations Analyst | Service Fulfillment |
| General Clerk II (Intermediate Clerk A | Senior Clerk |
| General Clerk III | Systems Coordinator |

MIS:  All positions within the Management Information Systems Department ("MIS").

SF Gate:  All positions within SF Gate except:

| | |
|---|---|
| Digital Media Planner | Online Photo Editor |
| Electronic Editor | Online Sales Account |
| Inside Sales Account | Executive |
| Executive | Online Client Services |
| Online Ad Traffic | Coordinator |
| Coordinator | |
| Online Copy Editor | |

(d)   All positions newly created by the Employer during the term of this Agreement, and which are of a supervisory, managerial or confidential nature, shall be exempted from all the terms of this Agreement, provided, however, that the Guild shall receive written notification from the Employer of each newly created position and the Guild may, within sixty (60) days of receipt of such notification, initiate discussions with the Employer to discuss the exempt designation. The Employer's designation of the exempt status of a new position shall be subject to the grievance and arbitration procedure set forth in this Agreement.

(e)   No Employee shall be compelled to accept a position out of the bargaining unit.

(f)   Reporters shall not be transferred to the position of Copy Editor for punitive reasons.

## ARTICLE II   GUILD SHOP

(a)   All Employees shall apply for membership in the Guild. In the event of failure to become a member no later than thirty (30) days from the start of his/her employment, or thirty (30) days from the effective date of the Agreement in effect at the time of the start of his/her employment and providing for Union membership as a condition of employment, whichever is later, the Employee shall upon formal notice from the Guild be discharged. All Employees who as of such date are or become members of the Guild shall remain members in good standing during the term of this Agreement, and for failure to do so shall be discharged upon formal notice from the Guild. This provision does not apply to Employees hired before January 1, 1963, and who have not subsequently become members of the Guild. This provision also does not apply to any person or Employee hired on or after ratification of the Amendment whose primary responsibility

4

is to sell advertising, including but not limited to Account Executives, Online Account Executives, and ChronDirect Salespersons.

(b)     The Guild will indemnify and hold the Employer harmless against any claims made by or on behalf of any Employee who the Employer discharges pursuant to paragraph (a) above.

## ARTICLE III    CHECKOFF

Upon an Employee's voluntary written assignment, the Employer shall deduct from the earnings of such Employee and pay to the Guild in accordance with the Employer's payroll schedule (i.e., either weekly or bi-weekly), all membership dues levied by the Guild. Such membership dues shall be deducted from the Employee's earnings in accordance with a schedule furnished to the Employer by the Guild on the first day of each month. An Employee's voluntary written assignment shall remain effective in accordance with the terms of such assignment. All such assignments and deductions shall be made in conformity with local, state and federal legislation.

## ARTICLE IV    NO DISCRIMINATION

(a)     Whenever one gender is used in this Agreement, it shall be construed to mean either sex.

(b)     There shall be no discrimination in hiring, retention or promotion because of race, creed, color, sex, national origin, age, height, weight, disability, sexual orientation, sexual identity, marital status, domestic partner status, veteran status, membership or activity in the Guild.

(c)     The parties agree to cooperate in efforts, consistent with this Agreement, to accomplish a balanced workforce including racial minorities and women. The Employer and the Guild shall meet within three (3) months of the execution of the new Agreement to create a Diversity Committee, which shall meet on a regular basis thereafter, to help achieve the goals of a diverse workforce and to address other diversity concerns. Factors to be considered in achieving this goal shall include population, the pool of qualified applicants, the availability of openings within the bargaining unit, and other relevant factors. The goal referred to herein, or any other proposal or goal that may be developed in the meetings established by this subsection, shall not be subject to the grievance and arbitration process. Either party may, however, raise in the grievance and arbitration procedure of this Agreement a failure of the other party to meet and discuss the subjects covered herein.

(d)     The terms and conditions of this Agreement, including but not limited to those provisions relating to recruitment, hiring, layoff, promotion, transfer, recall and seniority, shall not be construed, interpreted or implemented so as to conflict with requirements of the non-discrimination laws or so as to conflict with any agreement to which the Guild and the Employer are parties resolving any proceeding alleging violation of the non-discrimination laws. If and when either party believes an actual situation has developed in which implementation of this Agreement would conflict with the non-discrimination

laws, it shall immediately raise the matter with the other party for discussion and appropriate action.

(e)     The Guild and the Employer agree to establish a joint Labor/Management Committee, the purpose of which shall be to discuss matters of mutual concern which will enhance the relationship between the parties to this Agreement. The Guild and the Employer may agree to establish other committees for the purpose of promoting dialogue and exchange of information between Employees and management to promote more harmonious working relationships. No committee of Employees will be recognized by the Employer which the Guild has not authorized. Any committee established herein shall not take up matters subject to the grievance and arbitration procedure as set forth in this Agreement.

## ARTICLE V   INFORMATION

(a)     The Employer shall furnish to the Guild in writing within ten (10) days after their employment or transfer the following information for all persons hired or transferred into the Guild jurisdiction after the effective date of this Agreement:

(1) Name, address, telephone number, birth date, sex, race and social security number.
(2) Date of hiring or transfer.
(3) Agreement classification.
(4) Experience rating and experience anniversary.
(5) Status (including whether part-time or temporary; if temporary, for what purpose).
(6) Department (including sub-department).
(7) Place of work if not in main plant.
(8) Salary.
(9) Formula for any commission or bonus arrangement.

(b)     The Employer shall notify the Guild in writing, within thirty (30) days, of changes the Employer receives concerning the above information, and within ten (10) days of any leaves of absence or returns from leaves.

(c)     The Employer also shall furnish to the Guild in writing the name, job classification and wage of any Employee whose employment has been terminated by resignation, retirement or death within ten (10) days after such termination. In the event of death of any Employee, the Employer shall provide the Guild with the name or names of such beneficiaries as named by the deceased.

(d)     Any notices required to be given under this Article in writing may also be given by electronic transmission such as e-mail.

## ARTICLE VI   GRIEVANCE AND ARBITRATION PROCEDURE

(a)     A grievance committee, designated by the Guild, shall be established to settle amicably with a committee appointed by the Employer, all grievances arising under this Agreement.

(b)     A grievance shall be submitted only by a written notice from the complaining party to the other party briefly setting forth the facts giving rise to the grievance, the ground of complaint and the remedy sought. A grievance must be submitted in writing within twenty-one (21) calendar days of when the grieving party knew or should have known of the action or event giving rise to the grievance. The parties agree to meet within fifteen (15) calendar days after notification by either side that it has a grievance open for discussion.

(c)     Any grievance filed on or after the date upon which this Amendment is signed, other than a grievance protesting a discharge for good and sufficient cause or discipline, shall not be subject to arbitration for the duration of this Agreement unless the parties mutually agree in writing otherwise, such agreement not to be unreasonably withheld. A grievance raised under (b) above may be moved to arbitration by either party at any time more than fifteen (15) calendar days after receipt of the written notice in (b) above, but in no event later than forty-five (45) calendar days of receipt of such notice (this time may be extended by mutual agreement). Any grievance not moved to arbitration within said thirty (30) calendar days shall be deemed abandoned. A party's decision to forgo arbitration of a grievance shall not prejudice that party from pursuing through arbitration a future alleged violation of the same sort. The motion for arbitration shall be by written notice from the moving party to the other party. The parties then shall take the issue to arbitration according to the procedures hereinafter set forth.

(1)     The Employer and the Guild agree to the following panel of ten (10) arbitrators: John Kagel, John LaRocco, Gerald McKay, Charles Askin, Thomas Angelo, Thomas Roberts, Anita Christine Knowlton, Kathy Kelly, Barry Winograd, Frank Silver.

(2)     Within five (5) days after receipt of the written notice of arbitration, the parties shall meet and select an arbitrator from the panel set forth in paragraph (1) above. In the event there is disagreement as to which of these arbitrators shall serve, an arbitrator shall be selected by the elimination process.

(3)     In the event that the arbitrators on the panel set forth in paragraph (1) above are unable or unwilling to serve in any arbitration, the parties shall select an arbitrator in the manner prescribed in the California Code of Civil Procedure Section 1281.6. This procedure shall be followed by asking the Presiding Judge of the San Francisco Superior Court to select an arbitrator by the method provided in C.C.P. Section 1281.6 without the filing of a petition.

(4)     The party seeking arbitration shall state in the written notice of arbitration whether the procedure in paragraph 5 or 6 of this section (c) shall be followed, and in the case of paragraph 5, shall submit written proof that it has secured the written consent of the other party to the Informal Hearing procedure.

(5)     Informal Hearing:  The hearing shall be without transcript and without formalities normally attendant upon a formal arbitration.  In such cases, the arbitrator's decision and remedies shall be issued at the conclusion of the hearing if such issuance is deemed possible by the arbitrator.  Otherwise, the arbitrator's decision and remedies shall be issued as soon as possible thereafter.  In either instance, the arbitrator's decision and remedies shall be reduced to writing; and, at the arbitrator's option, may or may not include an opinion.

(6)     Formal Hearing:  The hearings shall be with a transcript and the normal formalities attendant upon a formal arbitration.  The arbitrator's written opinion, decision and remedies shall be issued as soon as possible after receipt of the transcript and briefs if they are filed.

(7)     The Informal Hearing procedure should be limited to cases where there is no substantial difference between the parties as to the facts of the grievance and where a large number of witnesses would not be required in the presentation of the case; otherwise, the Formal Hearing procedure should be invoked.  The Informal Hearing procedure may only be followed upon the written consent of the Employer and the Guild.

(8)     The sole function of the arbitrator shall be to interpret the express provisions of this Agreement and apply them to the grievance.  The arbitrator shall have no power to modify, supplement or otherwise alter the terms of this Agreement.

(9)     The decisions including remedies issued by the arbitrator shall be final and binding.  All issues concerning arbitrability shall be submitted only to the arbitrator for decision, and such decision shall be final and binding.

(10)    The arbitrator shall follow rules of procedure agreed to by the parties, but in the absence of agreement thereon, the Labor Arbitration Rules of the American Arbitration Association shall govern.

(11)    Expenses of arbitration which are jointly incurred shall be shared equally by the parties, except that neither party shall be required to pay any part of the cost of a stenographic record without its consent, provided that failure of a party to agree to share the cost of such stenographic record shall be deemed a waiver of such party's right of access to the record.

(d)    Renewal of this Agreement shall not be an arbitrable matter and is not subject to any of the provisions of this Article.

(e)    All past practices and agreements not specifically incorporated in this Agreement are of no force and effect.

## ARTICLE VII    JOB SECURITY

(a)     Discharges may be either (1) for good and sufficient cause, or (2) to reduce the force. Discharges for good and sufficient cause may include incompetent or unsatisfactory job performance. The Employer shall be the judge of competency and unsatisfactory job performance, and shall exercise such judgment in a reasonable manner. Employees shall be afforded reasonable opportunities to correct deficiencies when practicable.

(b)     In any case where the Employer discharges for cause any regular Employee of thirteen (13) or more consecutive calendar weeks' service, the Employer shall provide written notice to the Guild in advance or concurrent with such termination. In the event of gross misconduct or in the case of an Employee with less than thirteen (13) consecutive weeks' service, the Employee may be discharged without advance or concurrent notice to the Guild. A newly hired Employee shall be considered a probationary Employee for a period not to exceed thirteen (13) weeks. The probationary period may be extended for up to an additional thirteen (13) weeks with the consent of the Guild, such consent not to be unreasonably withheld. The probationary period will begin for all newly hired Employees after completion of any Employee training program for sales jobs, classified telephone sales jobs, and customer service representative jobs. During this probationary period (or during the training period referred to in the prior sentence), the Employee shall be subject to discharge without recourse to the grievance and arbitration procedure of this Agreement. A probationary Employee's work performance shall be reviewed periodically, including a discussion with the Employee of Employee's job progress, provided, however, that such reviews shall not be subject to the grievance and arbitration procedure of this Agreement, and the failure to conduct such reviews shall not prevent the Employer from discharging a probationary Employee in accordance with this subsection.

(c)     The prerogative of the Employer to discharge to reduce the force shall be maintained and shall not be subject to grievance or arbitration or other legal challenge by the Guild and its members. Upon notice of discharge or layoff, an Employee making a written request within seven (7) calendar days shall receive in writing from the Employer a statement of the cause of the Employee's discharge or layoff.

(d)     Discharges for cause and any other disputes as to the application of the provisions of this Article VII shall be subject to grievance and arbitration as provided in Article VI of this Agreement, except in cases where the right to grievance and arbitration has otherwise been excluded in this Article VII or Article VI.

(e)     In the event the arbitrator orders reinstatement of any Employee who has been dismissed under the provisions of this Article, such Employee shall be reinstated to Employee's position with an unimpaired service record. The arbitrator shall determine other conditions of reinstatement, including but not limited to back pay. This section shall not be construed in any manner which provides dismissal pay in addition to back pay.

(f)     Reductions in Force

        The Employer shall have the unqualified right to reduce the number of Employees

without regard to classification or department by layoff and to determine which Employees are to be laid off, which rights shall not be subject to grievance or arbitration. The effective date of a layoff shall be the date set by the Employer in its notice to the Employees concerned, with a copy to the Guild. The Employer will provide the Guild and the affected Employee(s) two (2) weeks notice or pay in lieu of such notice prior to the effective date of layoff. This notice requirement or pay in lieu thereof shall not apply to a discharge of an Employee for good and sufficient cause.

Any Employee who is discharged other than for good and sufficient cause or who is accepted for a voluntary termination incentive program shall receive upon execution of a separation agreement and general release in a form acceptable to the Employer (i) a severance payment equal to 2 weeks' pay for each year of service (pro rated for a partial year) up to a maximum of 52 weeks at the Employee's base wage rate in effect at the time of lay off, and (ii) COBRA continuation coverage commensurate with the length of the severance payment paid by the Employer on an Employee's behalf who is eligible for and who timely elects COBRA coverage.

(g)     In accordance with this Article VII, the Employer has authority to select Employees from any source, be the judge of competency and the number of Employees required.

(h)     Temporary Employees may be laid off without regard to the provisions of this Article.

## ARTICLE VIII     RETIREMENT

(a)     The parties have negotiated changes to the Media Guild Retirement Plan as restated January 1, 2003 (the "Plan"), and to the related Trust Agreement (the "Trust"), which changes are being executed contemporaneously with the execution of this Agreement to the Plan Trustees. This Agreement shall only become effective upon the Trustees' amendment of the Plan and Trust in accordance with the agreed-upon changes set forth in Addendum A (Media Guild Retirement Plan, Fourth Amendment).

(b)     The Employer shall make a payment of $134.70 per week per paid full-time Employee (with pro rata of this amount for part-time Employees) into The Media Guild Retirement Plan at the end of each month for the term of this Agreement.

(c)     Notwithstanding any other provision of this Agreement, the Employer's obligation to make contributions to The Media Guild Retirement Plan is contingent upon the full deductibility of such contributions under the Internal Revenue Code. In the event that contributions to The Media Guild Retirement Plan are ever nondeductible, the Employer's obligation to contribute to such plan shall be reduced to $0 per week per full-time Employee and shall not return to the contribution amount otherwise required under this Agreement until such contributions are again fully deductible under the Internal Revenue Code.

(d)     Changes to the Plan adopted by the Trustees of the Plan shall automatically be incorporated into and made part of this Agreement.

(e)     The Plan shall be terminated in a mass withdrawal upon the Plan's actuary certifying in writing that it is fully funded on a plan termination basis so that no withdrawal liability would be due in connection with such mass withdrawal.

## ARTICLE IX   TRANSFERS

(a)     The Employer shall have the right to transfer Employees between work locations as the Employer deems necessary.

(b)     No Employee shall be transferred by the Employer to work in another location outside a 75-mile radius of the Employer's main office building without the Employee's consent. The Employer shall reimburse any Employee who consents to a transfer to another location for reasonable relocation expenses.

(c)     Any payments or time allowances previously in effect for any transfers will be discontinued within two (2) weeks of the effective date of this Agreement.

## ARTICLE X   HOURS AND OVERTIME

(a)     Except for those Employees as are otherwise provided for in this Agreement, eight (8) hours within eight and one-half (8½ ) consecutive hours shall constitute a work day, and five (5) days shall constitute a work week for all Employees.

(b)     Overtime shall be paid at the rate of time and one-half.  Overtime shall be defined as work beyond eight (8) hours in the work day or beyond forty (40) hours in a work week except as otherwise provided in this Agreement.

(c)     Overtime shall be worked only when required by the Employer. The present practice of computing and recording overtime shall be continued.  Computation of overtime shall be made on the basis of total straight time weekly earnings for the week in which the overtime occurs.  Compensatory time off may be taken in lieu of pay, at the rate of time and one-half, at the option of the Employee and with the approval of the Employer, provided that compensatory time is taken in accordance with state and federal law.  In the event of a dispute about an Employee's overtime, the overtime record of the Employee involved in the dispute will be made available upon request.

(d)     The following positions are exempt from the hours and overtime provisions of this Agreement but are covered by all other terms of the Agreement:

Cartoonists;

Columnists;

Outside Salespersons;

Senior Political Writers;

Any Employee who enters into a personal services agreement that provides for wages 10% above the maximum wage level for Employee's classification, and at least 30% above California's minimum wage;

Any Employee who qualifies as exempt from overtime regulations under state and federal law provided that the Employer informs the Employee in writing of the change in status.

(e)    Schedules of work days and starting times shall be posted no later than 1:00 p.m. on Monday for the next week. The starting times so posted may be revised after the schedule is posted to adjust for developments beyond the control of the Employer, except that no such revisions shall be made after Friday preceding the week, or within forty-eight (48) hours of the day affected by such revision. However, an Employee may be required to perform work outside the schedule so posted. With the consent of the affected Employee, the Employer may change a starting time when the shift is predicated on coverage of a specific scheduled event and the event is cancelled after the deadline for schedule changes. In the event of a breaking news event, the foregoing scheduling rules shall be suspended for the duration of the coverage of the breaking news event. Notwithstanding any provision of this subsection (e), the Employer shall have complete discretion to revise schedules when the Employer reasonably determines that the demands of the business so require.

(f)    Unless requested by the Employee, an Employee shall not be required to remain on duty more than five (5) hours after the beginning of Employee's shift without a meal period. The meal period shall not be considered as part of the hours of work. Days off shall be consecutive insofar as practicable. Regular days off shall not be changed because of the provisions of Article XI (Holidays). The Employer shall establish and post regular days off for all Employees. Where it is necessary to change the regular days off, the Employee shall be notified in writing of the change as far in advance as possible. The notice shall state whether the change is temporary or indefinite. If it is temporary, the Employee will be advised of the probable date for return to the regular days off. Rotation of off days shall be permitted where Employer and Employee agree.

(g)    That part of a scheduled shift within any period less than twelve (12) hours after the completion of the previously scheduled shift shall be paid for at the overtime rate. Any time worked within eight (8) hours after the Employee goes off duty shall be paid for at the overtime rate. This provision shall not apply to Employees who work from home.

(h)    The provisions of paragraph (e) above shall not apply to Employees on out-of-town assignments, provided the Employee is notified prior to conclusion of the Employee's current shift.

(i)    The time spent by Employees traveling to and from assignments, including travel time on overnight assignments, shall be considered working time. Provided that travel time while on assignments shall not be considered working time when such travel time is a part of the assignment itself rather than incidental thereto, such as travel involved while touring with an athletic team on a road trip or a political candidate on a campaign swing for

periods in excess of twenty-four (24) hours; in such cases the Employee shall receive Employee's regular pay plus any overtime worked but shall not receive any additional pay for the time traveling on such assignment. Insofar as possible, the travel time shall be scheduled within the normal work day. Where the Employee is permitted a choice of more than one form of transportation, the shortest time by which the assignment can be reached shall be allowed. Insurance now in effect covering Employees using air transportation in performance of assigned duties shall be maintained. The terms of this Article X shall not apply to Employees while on assignments out of the United States.

(j)     Except where the Employee requests otherwise in writing, such Employee's weekly schedule shall provide for no more than two different starting times, or no more than three if the spread between them is no more than four hours.

(k)     A scheduled split day off shall allow at least thirty-five (35) hours between the scheduled completion of the previous shift and the scheduled start of the following shift.

(l)     An Employee called back to work while on vacation shall be paid at time and a half the straight-time pay rate for all time worked, in addition to vacation pay. The minimum additional pay shall be the equivalent of at least a full day's pay at the straight-time rate. The provisions of this subsection(s) shall apply only to Employees involuntarily called back by the Employer.

(m)    Alternative Schedules:  Subject to agreement between the Employer and the Guild, Employees may be permitted by the Employer to work alternative schedules including a four-day work week, flex schedules, job sharing and/or telecommuting.

## ARTICLE XI    HOLIDAYS

(a)     The following holidays or days observed as such shall be recognized as legal holidays: New Year's Day, Washington's Birthday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. If the holidays above enumerated shall fall upon a Saturday or Sunday and the following or prior day, as the case may be, is declared to be or is by law a holiday, the provisions contained herein shall apply only to the following day or the actual day observed as the holiday.

(b)     Employees required to work on any of the aforementioned holidays shall be paid at the overtime rate for all time worked on that day.

(c)     For defining the period for which holiday pay herein applies, the holiday shift shall be any shift regularly scheduled to start during the 24-hour period between 12:00 midnight the eve of the holiday and 12:00 midnight the night of the holiday, and shall not be construed as applying to regular shifts which may overlap into any holiday.

(d)     Employees whose regular day off falls on a holiday, or whose vacation time includes a holiday, shall be compensated by receiving an additional day off at another date, to be arranged by mutual agreement, provided that if mutual agreement is not reached the

13

additional day(s) off shall be added to the Employee's next vacation and will be subject to scheduling as any other vacation time. Part-time Employees working less than a five (5) day week shall be excluded from the provisions of this subsection. If such additional time off is not taken within twelve (12) months of the occurrence of the holiday, the Employee shall be compensated in cash in lieu of the time off.

(e)     Schedules for work on recognized holidays within departments shall be arranged so that Employees who prefer the time off shall not be required to work more than four (4) recognized holidays during the calendar year except when holiday assignments cannot be filled without requiring such work.

## ARTICLE XII    VACATIONS

(a)     Effective January 1, 2011, Employees shall receive vacation pay based on continuous employment in accordance with the following schedule:

Less than (2) years – 1/22.5th of a day's pay for each day worked in the calendar year to a maximum of 10 days.

Two (2) years or more up to ten (10) years – 1/14.6th of a day's pay for each day worked in the calendar year to a maximum of 15 days.

Ten (10) years or more – 1/10th of a day's pay for each day worked in the calendar year to a maximum of 20 days.

All vacation must be taken in the year in which it is earned or else it will be forfeited unless a manager or supervisor in the applicable department permits an Employee to carry over time. Vacation time otherwise will not be allowed to be carried over from year to year.

Employees may request to take unpaid vacation time in excess of what they accrue under this Article. The Employer shall have the sole discretion to grant or deny requests to take unpaid vacation time.

However, an Employee who loses paid vacation entitlement because of unpaid leave in the year shall have the right to take additional unpaid vacation up to the maximum entitlement based upon the Employee's length of service. This unpaid vacation entitlement must be scheduled in accord with the procedures set forth in this Article for paid vacations. Any additional unpaid vacation accruing under this provision may not be used in conjunction with or attached to the unpaid leave giving rise to the unpaid vacation entitlement.

(b)     (1)     Vacations shall be scheduled beginning January 1 and ending with December 31 of each year. The Employer shall determine the number of Employees, if any, to be allowed vacation during any week. Employer shall schedule the vacations in the various departments in accordance with the needs of the office and shall give

14

due consideration to length of service in assigning vacation periods. With the consent of the Employee and the Employer, the vacation may be split. Vacation schedules shall be posted no later than December 1, preceding the year in which the vacation is taken.

(2)     Employees allowed to split a vacation into two or more periods shall be permitted to exercise a seniority claim on one such period. Each additional period shall be considered a separate claim, which may be made only after all other Employees in the classification in that department have had an opportunity to exercise their seniority claims in a like manner.

(3)     By mutual agreement of the Employer and the Employee, an Employee's vacation may be split into increments of a minimum of one day. (1) Such arrangements shall be outside of the posted vacation schedule, and shall be granted when consistent with the business needs of the individual department; (2) There shall be a maximum limit of five (5) vacation days per Employee, per year, that may be split into one-day increments; and (3) This limit shall not be construed as a guaranteed entitlement of permission for any one-day vacation increments for any Employee if not consistent with the business needs of the individual department.

(4)     Employees shall have the right to use up to five (5) days of vacation entitlement annually for family emergencies. Domestic partners are recognized as such "family."

(c)     Leaves of absence and sick leave granted by the Employer shall not count as breaks in continuous service in computing vacation entitlement, nor shall time on such leave be considered service time. An Employee whose service terminates shall receive accrued vacation pay.

(d)     For an Employee compensated on a bonus or commission arrangement, vacation pay shall be computed at the weekly salary in effect that would correspond to the Employee's year level for Schedule A (exclusive of bonuses, commissions and payments for special work.) Employees who are commission-only will not receive any vacation pay.

## ARTICLE XIII     SICK LEAVE

(a)     Employees shall accumulate sick leave each year at full pay at the rate of ten (10) days a year for each completed year of service. Time on unpaid sick leave will not be counted as service time for the purpose of earning sick leave. Amounts received by an Employee under local, state or federal law in lieu of earnings shall not reduce the Employee's sick leave as accumulated in accordance with this Article.

(b)     Payment of Sick Leave: An Employee becoming ill or disabled shall be entitled to receive regular pay (exclusive of bonuses, commissions, payments for special work and overtime) for the period of illness or disability to the extent of the total accumulated sick leave credit standing in the Employee's account at the time of such illness or disability.

Sick pay paid to an Employee shall be deducted from the Employee's accumulated credit and the accumulated credit reduced by the amount thereof.

The Employer shall deduct from sick pay the amount which the Employee is entitled to receive under local, state or federal law in lieu of earnings, provided the Employer gives the Employee written notice of intent to do so in time for the Employee to file for the government benefits. In such case, only the net pay actually paid by the Employer shall be deducted from the Employee's accumulated sick pay credits. This deduction shall apply to pregnancy or maternity sick pay as provided for in (f) below.

An Employee shall be given written notice, with a copy to the Guild, before sick pay is to be terminated and when eligibility for paid sick leave has been regained.

(c)  Accumulation: Unused days of sick leave may be accumulated and applied to any future illness.

(d)  Employees claiming benefits under this Article shall, upon request, submit to an examination by a doctor chosen by the Employer.

(e)  No deduction shall be made for sick leave from overtime credited or to be credited to the Employee.

(f)  Pregnancy or Maternity Sick Pay: The provisions of this Article XIII shall apply to disabilities related to pregnancy, the same as to other disabilities. To the extent that an Employee has accumulated paid sick leave credit under this Article, she shall be entitled to receive paid sick leave. In no event shall the Employer be required to provide paid sick leave in excess of an Employee's accumulated credit. An Employee taking a leave under the Family Medical Leave Act and/or the California Family Rights Act and/or the California Pregnancy Disability Act and who becomes disabled during such leave shall be placed on sick leave status under the provisions of this section (f).

(g)  Kin Care: Employee may use up to twelve (12) days of accrued sick leave to care for certain family members as family members are defined under the San Francisco Sick Leave Ordinance, provided that an Employee has accrued sick leave sufficient to cover the requested leave time under this subparagraph. Such time as may be taken for kin care shall reduce the Employee's accrued sick leave balance, but shall not otherwise affect the Employee's ability to draw from the accrued sick leave balance for personal illness or injury. Similarly, personal use of sick leave shall not reduce time available for kin care, other than reducing the Employee's sick leave balance.

## ARTICLE XIV   HEALTH AND WELFARE

a)  In addition to the weekly wage rates paid under the terms of this Agreement, it is agreed that the Employer shall make a payment of $148.28 per week per full-time Employee (with pro rata of this amount for part-time Employees) into the Media Guild Health &

Welfare Trust Fund as established on June 10, 1964, at the end of each month through and including December 31, 2013, provided that if at any time the Media Guild Health & Welfare Trust Fund ceases to provide health care benefits to the Employees, or ceases to provide the same or substantially similar health care benefits as being provided through the Trust as of the effective date of this Agreement, Employer's obligation to make payments to the Trust under this Section XIV(a) ceases immediately.

b) Beginning January 1, 2014, Employer's contribution to the Media Guild Health & Welfare Trust Fund as established June 10, 1964 will cease. Thereafter, Employees shall be eligible to join the health care plans that are generally available to non-represented employees of the Employer, subject to the same terms and conditions (including any employee contributions) that apply to non-represented employees of Employer, which terms and conditions may change at the sole discretion of the Employer. Employees shall be subject to the same premium rate increases or decreases as non-represented employees. The Employer shall have the unqualified right to change the health care plans offered to the Employees at any time during the term of this Agreement, so long as such change also affects non-represented employees.

Up to and including December 31, 2013, the Employer shall continue to make Health and Welfare contributions for two (2) complete calendar months on behalf of any Employee who has been discharged to reduce the force under the provisions of Article VII (f) herein. The amount of each of these two (2) monthly contributions shall be equal to the amount of the contribution made on behalf of the Employee for the Employee's last month of work. The Employer shall be under no obligation to make Health and Welfare contributions for Employees discharged for cause or who voluntarily terminate employment. After December 31, 2013, Employer shall provide two months of medical coverage in the existing Employer-provided health care plan on behalf of any Employee who has been discharged to reduce the force under the provisions of Article VII(f) herein.

## ARTICLE XV   LEAVES OF ABSENCE

(a)   Unless otherwise required by law, the Employer may grant in its sole discretion unpaid leaves of absences to Employees who request any leave for any purpose. The Employer shall solely determine the number of Employees on leave at any one time. Unless otherwise required by law, Employees returning from leaves shall be reinstated to the extent that a position is available for them at the time the Employee requests reinstatement. If an Employee is not reinstated, the Employee will be considered laid off and eligible for severance as provided in Article VII (f).

(b)   In the event an Employee is elected or appointed to any Guild office, or office of a local of the Guild, such Employee shall be given a leave or leaves of absence should the Employee request such leave, and the Employee shall be reinstated in an available position as determined by the Employer upon expiration of such leave, provided time spent on leave as an Employee of the Guild shall be included in determining seniority as an Employee of the Employer for the purpose of reductions in force and for determining

length of and scheduling of vacations, only but not for any other purpose. The number of Employees on leave under this paragraph shall be limited to three (3) at any one time, except by mutual consent. The foregoing shall also apply to delegates elected to the TNG and AFL-CIO Conventions, both national and local. Right to reinstatement shall terminate in the event that the Employee on leave engages in gainful employment other than that for which leave was granted.

(c)     Maternity and paternity leaves shall be granted and administered in accordance with applicable law.

(d)     The Employer may require any Employee on a part-time schedule, that was in effect before the effective date of this Agreement, to return to a full-time schedule upon twelve (12) months written notice to the Employee, or the date upon which the part-time status would have ended under the former Agreement, whichever is earlier.

(e)     Unpaid leaves for major scholastic or newspaper research fellowships may be granted by the Employer for such time as is necessary for the Employee to meet the terms of the fellowship. The number of Employees, if any, to be on such leave at any one time shall be determined by the Employer.

(f)     Death in Family/Bereavement Leave: Any regular Employee covered by this Agreement who suffers a death in the family shall be granted three (3) consecutive work days off with full pay. Employees shall receive such paid days off in addition to, and irrespective of, the Employee's regular days off. No payment shall be made for any part of such leave which falls within the Employee's vacation period or other paid period when the Employee is not covering Employee's job. For the purposes of this section, "family" shall include spouse, domestic partner, parents or legal guardians, children, brother or sister, father-in-law, mother-in-law, grandparents, grandchildren, step-parents, step-children, brother-in-law and sister-in-law.

In addition to the above, an Employee shall have the right to use up to three days of vacation and/or in-lieu days for bereavement purposes for individuals other than those listed in the above paragraph. The three days set forth herein may not be used in conjunction with any other leave, including the three bereavement days set forth in this Article for bereavement of the death of family members in the above-listed categories, and the Employer may require verification of the basis for this request.

(g)     Leaves of absence granted under this Article shall not constitute breaks in continuity of service, but shall not be paid for, nor be construed as service time for any purpose, except as otherwise provided.

(h)     Any Employee hired, transferred or promoted as a replacement for an Employee on leave of absence under this Article shall be considered a temporary Employee in such position and shall be given written notice to that effect at the time of such hiring, transfer or promotion, with a copy of such notice to be sent to the Guild. The request for a leave of absence in excess of ten (10) working days (or the extension of any leave granted) shall

be made in writing and the Employer shall notify the Employee in writing if such leave is granted, with a copy to the Guild.

(i) Family Leave Act provisions are incorporated into this Agreement.

## ARTICLE XVI   MILITARY LEAVES

(a) Regular Employees:  With the exception of war leave replacement Employees, any Employee of more than six (6) months' employment who hereafter is required by law to leave the employ of the Employer to enter the armed forces of the United States or of any state, territory or federal district of the United States, or who after receiving orders to report for physical examination voluntarily enters such service for one term of enlistment, or who while the United States is at war voluntarily enters such service or the combat merchant marine, shall be granted a military leave of absence and shall be entitled to the benefits set out in subsections (a)(1) and (a)(2).

(1) Military Bonus and Vacation Pay:  At the time of beginning Employee's military leave, the Employee, provided he/she has completed not less than six (6) months' continuous employment with the Employer, shall receive four (4) weeks' military leave pay and pro rata vacation pay in addition to any compensation due.

(2) Reemployment:  Upon discharge, other than dishonorable, from any of the services enumerated, the Employee shall be restored to Employee's former position or to a position of like seniority, status and pay upon the following terms and conditions:

[a] The Employee shall have requested reemployment by the Employer either within ninety (90) days from the date of Employee's discharge or within ninety (90) days after recovery from service disabilities continuing after discharge for a period of not more than one (1) year, making reasonable allowance for return to place of employment.

[b] Unless the Employer and the Employee mutually agree otherwise, the Employer shall reemploy the Employee, and the Employee shall be available to begin such reemployment within two (2) weeks from the date of the Employee's request for reemployment.

[c] Time served by the Employee in any of the services enumerated shall, upon resumption of employment, be credited as time served in the employ of the Employer when computing benefits stemming solely from length of service with the Employer.

[d] Employees reemployed hereunder shall be given vacations in the first year of such reemployment in accordance with provisions of this Agreement.

(b)    Replacement Employees:  Any Employee hired, transferred or promoted as a replacement for an Employee on military leave shall be considered a temporary Employee in such position and shall be given written notice to that effect at the time of such hiring, transfer, or promotion, with a copy of such notice to be sent to the Guild, and shall be covered by the following provisions:

(1)    Any Employee who is transferred or promoted to replace an Employee on military leave may, upon the reemployment of the Employee on military leave, be returned to his/her previous position and salary, but at not less than the then current minimum for that position.  Any Employee so transferred and promoted, and while such transfer or promotion is temporary, shall receive credit for his/her employment in the experience rating to which transferred or promoted or in the position from which transferred or promoted, as may be mutually agreed.

(2)    Any Employee hired as a replacement for an Employee on military leave shall be covered by all the provisions of this Agreement except by subsection (a) of this Article XVI.

(3)    Any Employee hired as a replacement for an Employee on military leave shall, if inducted into the services enumerated in subsection (a) of this Article XVI under the conditions herein specified, be construed as a dismissed Employee.  If following discharge from such service under other than dishonorable conditions, such former Employee is rehired by the Employer as a regular Employee, he/she shall receive credits in accordance with the following formula:

[a]    Each month of military service up to a maximum of one (1) year shall be credited to such Employee and shall be used in computing all benefits under this Agreement which stem from length of service with the Employer.

[b]    Former Employees so rehired shall be given vacations in the first year of their employment in accordance with provisions of this Agreement.

(c)    Leaves of absence without pay not to exceed two (2) weeks shall be granted to Employees for required annual training services with the National Guard and the Army, Navy, Air Force, Marine and Coast Guard Reserves.

(d)    Other Leaves:  Leaves of Absence not specifically set forth herein may be granted in accordance with the provisions of Article XV of this Agreement.

## ARTICLE XVII    PART-TIME EMPLOYEES

(a)    A part-time Employee is one who is hired to work less than the work week provided in this Agreement.

(b)     Part-time Employees shall be subject to all provisions of this Agreement except as otherwise expressly provided in this Agreement. A part-time Employee working less than five days per week shall be eligible for holiday pay only when a holiday falls upon the Employee's normally scheduled work day.

(c)     Part-time Employees shall be paid on an hourly basis equivalent to the weekly minimum salary provided for their classification.

(d)     The Employer in its sole discretion shall determine whether an Employee may work part-time, the number of part-time Employees, and scheduling, reductions or increases in the number of hours a part-time Employee may work in any week.

(e)     At the conclusion of maternity/paternity leave, an Employee may request to be placed on part-time status for a period of time and under circumstances, scheduling, and assignment conditions as determined solely by the Employer.

## ARTICLE XVIII     TEMPORARY EMPLOYEES

(a)     A temporary Employee is one who is hired for a special project or as a substitute for a regular full-time or part-time Employee, in either case not to exceed fifty-two (52) consecutive weeks, provided that such time may be extended by mutual agreement between the Employer and the Guild; provided further, a temporary Employee may be hired by the Employer to fill the job of a person on an authorized leave of absence for the entire period of such leave. No contributions shall be required to be made by the Employer under Article VIII (Retirement) of this Agreement on behalf of any temporary Employee. The Employer may also hire 'On-Call' Employees on an as needed basis for longer than fifty-two (52) consecutive weeks who shall be considered temporary Employees, provided, however, that the Employer may not hire more than ten percent (10%) of the staff as On Callers in any classification or department. The Employer is not required to provide any specific employment opportunities to an On-Call Employee and may terminate the employment of any On-Call Employee at anytime by providing notice to the On-Call Employee with a copy of such notice to the Guild.    Effective upon the signing date of this Amendment, no contributions shall be required to be made by the Employer under Article VIII (Retirement) of this Agreement for any present or new On-Call Employees.

(b)     Temporary Employees, including On-Call Employees, shall be subject to the provisions of this Agreement except as otherwise expressly provided herein. Temporary Employees, including On-Call Employees, shall not be eligible to receive any severance payments or benefits for layoffs or termination of employment. Temporary employees in any classification affected by a reduction in force shall be terminated before any regular employees are laid off.

(c)     No temporary Employee, other than a substitute for a part-time Employee, shall receive less than a full day's pay for any work performed.

21

(d)     Any temporary Employee continuously employed who becomes a regular Employee shall receive full credit for previous continuous time worked in the calculation of benefits.

## ARTICLE XIX    SALESPERSONS

(a)     The Employer shall establish revenue goals for monthly or longer calendar periods for each advertising sales Employee and shall inform each Employee of his or her revenue goal. If the Employer wishes to adjust an Employee's revenue goal for any succeeding period, the Employee will be informed in advance of the next period of the adjusted revenue goal. If the Employee disagrees with the revenue goal, he/she may appeal the determination to his or her director. If the Employee disagrees with the director's decision, the Employee may appeal the decision to the vice president of advertising or her designee within the advertising department. The decision of the vice president of advertising or her designee with respect to the revenue goal shall be final.

A sales Employee who fails to achieve revenue goals established in accordance with this section in (i) three consecutive months or (ii) four months in any previous twelve month period may be subject to discipline up to and including termination, provided, however, that a failure to meet goal in any monthly period due to catastrophic losses and/or bankruptcy of an account, production errors that result in uncollected revenue, or other extraordinary business events having a direct impact on any of the Employee's advertising accounts, shall not be counted for the purposes of this section.

This Article and the actions taken by the Employer hereunder shall not be subject to the grievance and arbitration provisions of this Agreement or other legal challenge by the Guild and its members.

(b)     The following provisions shall apply to commission-only sales Employees working in retail, display and classified display advertising, both in print and online:

    (1)     The Employer may create as many such positions for the sole purpose of developing new business accounts; said Employees to be covered by all provisions of this Agreement except Article XXI (Minimum Salaries) and Article X (Hours and Overtime).

    (2)     No salaried Employee shall be transferred to a commission-only sales position without the Employee's consent.

    (3)     The Employer shall determine and may re-determine what advertising business commission sales Employees shall be permitted to solicit and the period for which an account may remain with a commission sales Employee.

    (4)     The Employer shall determine the commission structure and changes to any commission structure. The Employer shall provide to the Guild monthly the gross earnings of each commission-only salesperson for each and every month.

(5)     Benefits, including pensions, shall be calculated at the weekly salary in effect that would correspond to the Employee's year level for Schedule A (exclusive of bonuses, commissions and payments for special work) pay as set forth in Article XXI.  Employees who are commission-only will not receive any paid time off including but not limited to vacation pay, holiday pay and sick pay, but will be entitled to time off in accordance with Article XI (Holidays), Article XII (Vacations) and Article XIII (Sick Leave).

(c)     The Employer may create commission structures and may make changes to such commission structures, if any, for Employees working in advertising sales who also receive a base salary.

## ARTICLE XX     SF GATE

(a)     Individuals working at SF Gate as of February 16, 2001, and who are not represented by the Guild, shall not be required to become members of or pay dues to the Guild, notwithstanding any other provision of this Agreement.

(b)     All other Employees in the following positions, or in any new or retitled position doing the same kind of work in the same listed departments, shall be represented by the Guild:

> **Content/Editorial**
> Senior Online Editor
> Online Copy Editor
> Online Photo Editor
>
> **Advertising Sales**
> Inside Sales Account Executive
> Online Sales Account Executive
>
> **Advertising Operations**
> Online Ad Traffic Coordinator
> Online Client Services Coordinator
> Digital Media Planner

(c)     SF Gate shall not be required to compensate any Employee for SF Gate's use of material prepared by that Employee.

(d)     There shall be no restriction on the Employer's right to obtain content for SF Gate from any source.  Work performed for SF Gate by freelancers and/or stringers, which is considered for use in The Chronicle, shall be subject to the rules and procedures covering such work in this Agreement.

(e)     Employees working for SF Gate shall not be subject to the following provisions of this Agreement: Article X (Hours and Overtime) subsection (j); and subsection (g) shall only apply if the Employee has to be physically present in the Employer's office.

## ARTICLE XXI   MINIMUM SALARIES

The following shall be the minimum weekly salaries in effect during the term of this Agreement:

## SCHEDULE "A"

|        | 7/1/2011  | 7/1/2012  | 7/1/2013  | 7/1/2014  | 7/1/2015  | 7/1/2016  |
|--------|-----------|-----------|-----------|-----------|-----------|-----------|
| -1yr   | $813.62   | $825.82   | $838.21   | $850.78   | $863.55   | $876.50   |
| +1yr   | $914.86   | $928.58   | $942.51   | $956.65   | $971.00   | $985.56   |
| +2yrs  | $1,019.03 | $1,034.32 | $1,049.83 | $1,065.58 | $1,081.56 | $1,097.78 |
| +3yrs  | $1,048.13 | $1,063.85 | $1,079.81 | $1,096.01 | $1,112.45 | $1,129.13 |
| +4yrs  | $1,085.33 | $1,101.61 | $1,118.13 | $1,134.91 | $1,151.93 | $1,169.21 |
| +5yrs  | $1,174.34 | $1,191.96 | $1,209.83 | $1,227.98 | $1,246.40 | $1,265.10 |
| +6yrs  | $1,255.79 | $1,274.63 | $1,293.75 | $1,313.15 | $1,332.85 | $1,352.84 |

Archiving Supervisor; Assistant Editor; Cartoonist; Columnist; Copy Editor; Critic; Deputy Editor; Digital Media Planner; Editorial Artist; Editorial Designer; Senior Online Editor; Illustrator; Inside Sales Account Executive; Multimedia Editor; Online Associate Editor; Online Copy Editor; Online Editor; Online Multimedia Editor; Online Photo Editor; Online Producer; Online Sales Account Executive; Account Executive; Pagination Systems Administrator; Photographer; Podcast Producer; Reporter; Senior Editor; Senior Political Writer; Video Journalist; Web Developer; Web Production/Customer Support Rep.; Writer; Reporter (2 Year); Senior Search Strategist; SEO/Digital Account Performance Manager; Custom Publishing Editor.

An Employee in the position of "Reporter (2 Year)" shall receive a starting wage of 80% of the entry-level Schedule A minimum. After one (1) year in the position of "Reporter (2 year)," an Employee's wage shall be increased to 90% of the entry-level Schedule A minimum. At the conclusion of two (2) years in this position, the Employer may decide in its sole discretion whether to place the Employee in a regular reporting position and, if so, which position. If the Employee is not retained, he/she shall have no recourse to the grievance and arbitration procedure of the Agreement. If the Employee is retained, the Employee's wage shall increase to the Schedule A entry-level minimum. The Employee shall be deemed to be in a probationary period (as set forth in Article VII) during the entire time he/she is a "Reporter (2 Year)." Employer has sole and complete discretion to assign work and assignments to individuals in the position. Employer may have no more that five (5) individuals in this position at any one time without the Guild's agreement. Nothing in this provision is intended to be or shall be interpreted as a guarantee of any length of employment in the "Reporter (2 Year)" position or in any way restrict Employer from discharging a "Reporter (2 Year)" Employee before the Employee has held the position for 2 years. This provision is subject to the same expiration date as the rest of this Agreement.

## SCHEDULE "B"

The following shall be the minimum weekly salaries in effect during the term of this Agreement:

|        | 7/1/2011 | 7/1/2012 | 7/1/2013 | 7/1/2014 | 7/1/2015 | 7/1/2016 |
|--------|----------|----------|----------|----------|----------|----------|
| -1yr   | $609.03  | $618.17  | $627.44  | $636.85  | $646.40  | $656.10  |
| +1yr   | $652.54  | $662.33  | $672.26  | $682.35  | $692.58  | $702.97  |
| +2yrs  | $696.04  | $706.48  | $717.08  | $727.83  | $738.75  | $749.83  |
| +3yrs  | $739.55  | $750.64  | $761.90  | $773.33  | $784.93  | $796.71  |
| +4yrs  | $783.04  | $794.79  | $806.71  | $818.81  | $831.09  | $843.56  |

## SCHEDULE "C"

The following shall be the classifications and minimum weekly salaries in effect during the term of this Agreement:

### Classification IX

|        | 7/1/2011  | 7/1/2012  | 7/1/2013  | 7/1/2014  | 7/1/2015  | 7/1/2016  |
|--------|-----------|-----------|-----------|-----------|-----------|-----------|
| -1yr   | $911.48   | $925.15   | $939.03   | $953.11   | $967.41   | $981.92   |
| +1yr   | $952.91   | $967.20   | $981.71   | $996.44   | $1,011.38 | $1,026.55 |
| +2yrs  | $1,015.06 | $1,030.29 | $1,045.74 | $1,061.43 | $1,077.35 | $1,093.51 |
| +3yrs  | $1,118.63 | $1,135.41 | $1,152.44 | $1,169.73 | $1,187.27 | $1,205.08 |
| +4yrs  | $1,180.78 | $1,198.49 | $1,216.47 | $1,234.72 | $1,253.24 | $1,272.04 |
| +5yrs  | $1,242.93 | $1,261.57 | $1,280.50 | $1,299.71 | $1,319.20 | $1,338.99 |

Accountant (to +3); Finance ADMARC Coordinator; Graphic Artist/Designer; Lead Designer; Online Ad Traffic Coordinator; Preprint Coordinator; Print Buyer; Promotion Writer; Promotions & Events Specialist; Research Analyst; Spec Artist (to +3); Statistician (to +3); Advertising Commission Administrator.

### Classification VIII

|        | 7/1/2011  | 7/1/2012  | 7/1/2013  | 7/1/2014  | 7/1/2015  | 7/1/2016  |
|--------|-----------|-----------|-----------|-----------|-----------|-----------|
| -1yr   | $952.91   | $967.20   | $981.71   | $996.44   | $1,011.38 | $1,026.55 |
| +1yr   | $994.34   | $1,009.26 | $1,024.39 | $1,039.76 | $1,055.36 | $1,071.19 |
| +2yrs  | $1,015.06 | $1,030.29 | $1,045.74 | $1,061.43 | $1,077.35 | $1,093.51 |

The San Francisco Chronicle currently does not have any positions under this classification.

### Classification VII

|        | 7/1/2011  | 7/1/2012 | 7/1/2013 | 7/1/2014 | 7/1/2015 | 7/1/2016   |
|--------|-----------|----------|----------|----------|----------|------------|
| -1yr   | $787.18   | $798.99  | $810.97  | $823.14  | $835.48  | $848.02    |
| +1yr   | $849.33   | $862.07  | $875.00  | $888.13  | $901.45  | $914.97    |
| +2yrs  | $932.20   | $946.18  | $960.38  | $974.78  | $989.40  | $1,004.24  |

Accounts Payable Clerk; ChronDirect Coordinator; Classified Customer Account Reps (CAR); Classified Customer Service Reps (CSR); Control Clerk; Co-Op Coordinator; Digital Operator; Electronic Ad Makeup Operator; Events Marketing Assistant; ADMARC Specialist; Imaging Technician; Lead Sales Assistant; Media Relations Assistant; Online Ad Traffic Coordinator; Online Client Services Coordinator; Payroll Clerk; Prepress Ad Traffic Coordinator; Preprint Coordinator Assistant; Public Relations Assistant; Senior CCI/SCS Computer Operator; Senior Computer Operator; Senior Makeup Clerk.

Deductions for errors that arise from original copy, insertion, instruction, changes in copy or new instructions on copy on all regular business handled by a classified department Employee shall not exceed the amount of commission on the particular ad; provided that, in the case of errors resulting from the sale of "specials," the full amount of commission paid for the sale of such "specials" may be deducted. No deductions may be made for delinquent accounts where credit has been passed upon by the Employer. No deductions may be made for errors against Salespersons not receiving commission on original copy.

A Telephone Salesperson transferred to Outside Sales shall receive the minimum in the Outside Sales classification next above his/her salary at the time of such transfer.

**Classification VI**

|        | 7/1/2011  | 7/1/2012 | 7/1/2013 | 7/1/2014 | 7/1/2015 | 7/1/2016 |
|--------|-----------|----------|----------|----------|----------|----------|
| -1yr   | $725.04   | $735.92  | $746.95  | $758.16  | $769.53  | $781.07  |
| +1yr   | $766.47   | $777.97  | $789.64  | $801.48  | $813.50  | $825.71  |
| +2yrs  | $828.62   | $841.05  | $853.67  | $866.47  | $879.47  | $892.66  |
| +3yrs  | $870.66   | $883.72  | $896.98  | $910.43  | $924.09  | $937.95  |

**(Editorial Assistant only for +3 yrs)**

Bookkeeper (Cash Application, Cashier, Papercheckers); CCI/SCS Computer Operator; Collector; Customer Relations Analyst; Digital Coordinator; Editorial Assistant 3 **(only position to +3 yrs)**; Production Assistant; Receiving Supervisor; Returns Room Supervisor; Senior Clerk.

**Classification V**

|        | 7/1/2011  | 7/1/2012 | 7/1/2013 | 7/1/2014 | 7/1/2015 | 7/1/2016 |
|--------|-----------|----------|----------|----------|----------|----------|
| -1yr   | $673.25   | $683.35  | $693.60  | $704.00  | $714.56  | $725.28  |
| +1yr   | $704.33   | $714.89  | $725.62  | $736.50  | $747.55  | $758.76  |
| +2yrs  | $745.75   | $756.94  | $768.29  | $779.81  | $791.51  | $803.38  |

Ad Support Coordinator; Advertising Information Specialist; CIE Clerk; Dispatch Router; General Clerk III (Editorial Assistant 2); Prepress Proofreaders/Material Coordinators; Processing Coordinator; Reconciliation Fulfillment; Service Fulfillment; Systems Coordinator.

## Classification IV

|       | 7/1/2011 | 7/1/2012 | 7/1/2013 | 7/1/2014 | 7/1/2015 | 7/1/2016 |
|-------|----------|----------|----------|----------|----------|----------|
| -1yr  | $631.82  | $641.30  | $650.92  | $660.68  | $670.59  | $680.65  |
| +1yr  | $662.90  | $672.84  | $682.94  | $693.18  | $703.58  | $714.13  |
| +2yrs | $704.32  | $714.88  | $725.61  | $736.49  | $747.54  | $758.75  |

General Clerk II (Intermediate Clerk A, Mail Clerk, Editorial Assistant 1); Part Time Electronic Ad Makeup Operator; Customer Care Associate.

## Classification III

|       | 7/1/2011 | 7/1/2012 | 7/1/2013 | 7/1/2014 | 7/1/2015 | 7/1/2016 |
|-------|----------|----------|----------|----------|----------|----------|
| -1yr  | $590.38  | $599.24  | $608.22  | $617.35  | $626.61  | $636.01  |
| +1yr  | $621.46  | $630.78  | $640.24  | $649.85  | $659.59  | $669.49  |
| +2yrs | $662.90  | $672.84  | $682.94  | $693.18  | $703.58  | $714.13  |

Intermediate Clerk B; Telemarketer/Lead Generator.

## Classification II

|       | 7/1/2011 | 7/1/2012 | 7/1/2013 | 7/1/2014 | 7/1/2015 | 7/1/2016 |
|-------|----------|----------|----------|----------|----------|----------|
| -1yr  | $507.53  | $515.14  | $522.87  | $530.71  | $538.67  | $546.75  |
| +1yr  | $538.60  | $546.68  | $554.88  | $563.20  | $571.65  | $580.23  |
| +2yrs | $580.03  | $588.73  | $597.56  | $606.52  | $615.62  | $624.86  |

The San Francisco Chronicle currently does not have any positions under this classification.

## Classification I

|       | 7/1/2011 | 7/1/2012 | 7/1/2013 | 7/1/2014 | 7/1/2015 | 7/1/2016 |
|-------|----------|----------|----------|----------|----------|----------|
| -1yr  | $424.67  | $431.04  | $437.51  | $444.07  | $450.73  | $457.49  |
| +1yr  | $455.74  | $462.58  | $469.51  | $476.56  | $483.71  | $490.96  |
| +2yrs | $497.17  | $504.63  | $512.20  | $519.88  | $527.68  | $535.59  |

The Employer currently does not have any positions under this classification.

An Employee transferred from a lower classification to a higher classification in Schedule "C" shall receive the minimum in the higher classification next above Employee's salary at the time of such transfer.

An Employee shall receive at least five dollars ($5.00) per shift over the top minimum for Copypersons for any shift in which Employee supervises Copypersons.

## ARTICLE XXII   GENERAL WAGE PROVISIONS

(a)     The Employer shall have the right to hire new Employees at the experience level the Employer deems appropriate.

(b)     Salaries shall be paid weekly or bi-weekly, at the Employer's discretion, provided, however, if the Employer elects to change from one method of payment to the other, it will provide forty-five (45) days advance written notice of the change to the Guild.

(c)     Merit Increase/Personal Services Agreements:  An Employee shall be free to bargain individually for salary or commission above the minimum and to enter into a personal services agreement.  No employee shall be required to enter into a personal services agreement.  The Employer may reduce the compensation of an Employee with a personal services agreement upon the expiration of the personal services agreement, but in no event shall the Employee's compensation be reduced below the Employee's former salary level, including any across-the-board increases or experience increments occurring during the period of the personal services agreement.  The Employer shall be free to grant merit increases or one-time bonuses to Employees.

(d)     New Jobs:  Should the Employer create a new job which is covered by this Agreement, it shall notify the Guild in writing thereof.  On request of the Guild, the Employer shall meet with the Guild for the purpose of negotiating the minimum wage applicable thereto.  If agreement on such minimum cannot be reached within thirty (30) days or any mutually agreed extension of time after such meeting, then the Employer's determination of the wage shall govern.  Nothing herein shall prohibit the Employer from filling such job pending conclusion and final determination of such negotiations or arbitration.

## ARTICLE XXIII   EXPENSES AND EQUIPMENT

(a)     The Employer shall pay all legitimate expenses incurred by an Employee in the service of the Employer, provided, however, expenses have been pre-approved and the Employee submits a proper expense reimbursement form.

(b)     Photographic equipment required by the Employer to be used by photographers shall be supplied by the Employer.

(c)     (1)     An Employee who is required by the Employer to use his/her automobile on the business of the Employer must supply proof of liability insurance (including bodily injury, medical payments and uninsured motorists) of not less than $100,000 - $300,000, along with property damage insurance of not less than $20,000 (or a $300,000 "single limit" coverage which includes property damage), and such insurance shall be carried through a company satisfactory to the Employer.

        (2)     No Employee shall use a personal automobile on the business of the Employer, either occasionally or regularly, unless such automobile is covered by the liability (including bodily injury, medical payments, uninsured motorists and property damage) insurance required above.

(3)     In the event an Employee's automobile is damaged while on the business of the Employer, the Employer's liability to compensate the Employee for such damage shall be limited to the uninsured loss or two hundred fifty dollars ($250.00), whichever is less.

(d)     When an Employee uses his/her automobile on the business of the Employer, the Employee shall be compensated at the then applicable Internal Revenue Service ("IRS") rate for mileage reimbursement.

(e)     Company vehicles supplied by the Employer shall be equipped with approved seat belts for all passengers as required by law.

(f)     The Employer agrees to supply parking space at or near the place of employment for any company car assigned to an Employee or for the car of any Employee required to supply an automobile, provided said Employee is required to utilize said car regularly from said place of employment.

(g)     Any Employee who elects to use a company-owned parking lot for Employee's own vehicle will be required to pay the Employer for such use on the same basis that the Employer requires its other employees.

## ARTICLE XXIV    MANAGEMENT'S RIGHTS

Except as expressly abridged by any provision of this Agreement, the Employer reserves and retains all of its normal and inherent rights with respect to the management of the business in all its phases and details, including (without limiting the generality of the foregoing) its rights to determine, and from time to time re-determine, the number, location and types of its plants, operations, and the methods, processes, equipment and materials to be employed; to determine and re-determine the number of employees to be employed at any one time or place; to expand or discontinue conduct of its business or operations in whole or in part; to select and direct the working forces in accordance with the requirements determined by management; to establish and change work schedules and assignments; to subcontract any work; to transfer, promote or demote employees, or to lay off, terminate or otherwise relieve employees from duty for lack of work or other legitimate reason; to make and enforce reasonable rules for the maintenance of discipline; to suspend, discharge or otherwise discipline employees for cause; the right to enforce stated  and restated Employer policy; and otherwise to take such measures as the Employer may determine to be necessary to the orderly, efficient and economical operation of the business.

## ARTICLE XXV    HEALTH AND SAFETY

Hazardous Duty:  The Employer agrees that when an Editorial Department Employee performs hazardous duty, the Employee or the Employee's designated beneficiary is entitled to the following benefit, which is in addition to all other life insurance and death

benefits provided under this Agreement and the workers' compensation laws, and is independent of and has no effect on the Employee's paid sick leave entitlement, but the income continuation payments may be integrated with workers' compensation disability benefits:

> During the period of disability, 65% of weekly salary, not exceeding $500 per week, for a maximum of 60 weeks, such payment beginning with the first day of disability and to be without a waiting period.

## ARTICLE XXVI   NO STRIKE/NO LOCKOUT

The Guild and its members, individually and collectively, agree that during the term of this Agreement they will not instigate, encourage, authorize, cause, support or engage in any strike, including but not limited to sympathy strikes, picketing, boycott, slowdown, work stoppage, work interruption or work interference, of or with the operation of the Employer's business during the term of this Agreement. The Employer agrees that there will be no lock-out of Employees during the term of this Agreement.

## ARTICLE XXVII   MISCELLANEOUS

(a)    Bulletin Boards:  The Guild shall have the right to maintain bulletin boards in all Guild departments for the use of the Guild for the purpose of posting notices and official Guild business.

(b)    Outside Activity:  Without permission in writing from the Employer, no Employee shall use the name of the Employer or Employee's connection with the Employer or any featured title or other material of the Employer to exploit in any way Employee's outside endeavor.

(c)    Photographing and New Media:  Any editorial department Employee may be assigned to use a camera to take photographs or to use other new media including but not limited to camera phones as directed by the Employer.

(d)    Byline:  An Employee's byline or credit line shall not be used over the Employee's written protest.  A significant change in an Employee's byline copy shall be brought to the Employee's attention before publication whenever practicable.

If a question arises as to the accuracy of printed material, no correction or retraction of that material shall be printed without prior consultation with the Employee whenever practicable.

An Employee whose work or person is mentioned in a letter to the editor shall be informed, when practicable, before it is published, and if the letter criticizes the Employee personally, the Employee shall have the right to respond on the same page. The content of the response will be subject to the approval of the editor.

(e)   Jury Duty:  An Employee with at least one year of employment required to report for jury service on a day when he/she normally would have been scheduled to work any shift shall be paid for a maximum of thirty (30) days of such jury service in a calendar year at the Employee's regular straight-time shift's pay minus any pay received as such juryperson.  Such Employee's position need not be filled except at the option of the Employer.  To be eligible for such payment, the Employee must inform his/her department head in writing of the call to jury service within twenty-four (24) hours of receipt of the official notification (if the notice is received on a Friday, then such written notice will not be required; however, the Employee will inform his/her department head promptly on the following Monday by telephone or otherwise), and then must furnish his/her department head a statement of jury service from the Clerk of the Court.

(f)   Substance Abuse Policy:  Employees shall be subject to the Employer's Substance Abuse Policy, as the same may be amended from time to time; provided that before changes are implemented, the Guild will be notified and afforded an opportunity to bargain about the proposed change.

(g)   Ethical Standards Policy:  Employees in the editorial department shall be subject to the department's Ethical Standards Policy, as the same may be amended from time to time.

(h)   Interns:  The Employer has the right to establish or maintain an internship program, provided, however, no Employee shall be discharged because of such program.  Interns will not be Employees under this Agreement.

(i)   Performance Appraisals:  The Employer may use and rely upon performance appraisals or any other management assessment tool used in evaluating Employee's performance in any disciplinary or termination proceeding.

(j)   Voluntary Termination Incentives:  The Employer shall have the right to offer individuals a termination incentive to voluntarily resign.  Upon making such an offer, the Employer must notify the Executive Officer of the Guild that the Employee has been offered a voluntary termination incentive.  The Employee will be advised that the offer is voluntary and he/she may consult with the Guild.  The Guild will keep confidential the terms of any such offer.

(k)   Domestic Partners:  If legal, union pension funds, 401(k) plans and Health & Welfare plans will be amended to treat as spouses any individuals in a spousal relationship with Employees who cannot have a spousal relationship recognized by law.

(l)   Flexible Spending Account:  The Employer agrees to maintain the existing flexible spending account program for dependent care and for medical care.

**ARTICLE XXVIII    DURATION AND RENEWAL**

(a)    As herein provided, this Agreement shall be in full force and effect for a period from July 1, 2012, to and including June 30, 2017.

(b)    The salary rates set forth in this Agreement shall be effective in accordance with the dates in Article XXI hereof.

(c)    At any time within ninety (90) days prior to the termination of this Agreement, the Employer or the Guild may initiate negotiations for a new Agreement.

* * * * * * * * * * *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

San Francisco Chronicle
A division of Hearst Communications, Inc.

By: _____
        Jeffrey M. Johnson, Publisher

Pacific Media Workers Guild
Local 39521, TNG-CWA, AFL-CIO, CLC

By: _____
        Carl Hall, Executive Officer

_____
        Kathleen Anderson

Michael Cabanatuan

Jon Ferguson

Autumn Grace

## Addendum to Guild Agreement

I.     Bargaining Unit, Typographical Sector of the Pacific Media Workers Guild Union, Local 39521, TNG-CWA, AFL-CIO, CLC (the "BATU").

The bargaining unit covered by this Addendum consists of the following persons listed in order of seniority:

1.     Gloria La Riva
2.     Inetta Hines
3.     Joe Ryan
4.     Anna Sarpieri
5.     Heather Smith

The above-named employees are covered by the terms and conditions of the Collective Bargaining Agreement by and between The San Francisco Chronicle, a division of Hearst Communications, Inc. (the "Employer") and the Pacific Media Workers Guild Union, Local 39521, TNG-CWA, AFL-CIO, CLC (the "Guild"), dated July 1, 2012 through June 30, 2017 (the "CBA"), except as provided in this Addendum.

The employees in the bargaining unit may be assigned to any work.  Persons working as a Prepress Supervisor are excluded from coverage by this Addendum or the CBA.

II.    Attrition List

A.     The following employees constitute the "Attrition List" for purposes of this Addendum:

Gloria La Riva

No additional employees shall be added to the Attrition List.

There shall be no guarantee with respect to the number of employees to be employed under the terms of this Addendum.

B.     Guaranteed Work.  The Employer agrees that all employees on the Attrition List will be guaranteed forty (40) hours work in each week in which the employee makes himself or herself available for a full week of work on the days and shifts scheduled by the Employer, for the remainder of their working lives, unless terminated as a result of retirement, resignation, death, discharge, permanent disability, or disability resulting in inability to perform the employee's job with or without reasonable accommodation.

C.     Suspension of Guarantee.  In the event of a suspension of the Employer's newspaper operation, the guarantees provided for in this Section will be suspended for such period of suspension.  In case of a strike, work stoppage or lockout of employees not in violation

of this Addendum, the guarantees provided in this Section will be suspended for the period of such strike, work stoppage or lockout.

      D.    <u>Assignment after Training</u>.  Any employee on the Attrition List who refuses to avail himself or herself of the opportunity to train if offered by the Employer, or who refuses to work a full-time workweek scheduled by the Employer in a position the employee is competent to fill, shall be removed from the Attrition List and the Employer shall have no further obligation for such employee from his/her having been on the Attrition List.

III.    Chapel Organization

      Nothing contained herein shall be construed to interfere in any way with the BATU's operation of a Chapel organization nor in the establishment by such chapel of any rules for the conduct of its affairs, providing such rules are not in conflict with law, the CBA or this Addendum.  Members of a chapel have no right in chapel meetings to take any action amending, suspending or in any way affecting the laws or agreements of the BATU.

      The Chapel chairperson or acting chairperson, chosen by the Chapel, shall be assigned bargaining unit work by the Employer on the same basis as any other bargaining unit employee.

      Representatives of the BATU, Chairperson or Acting Chairperson, shall be exempt from discipline or discharge in the performance of their BATU duties so long as such activity does not interfere with the publication of the newspaper.

IV.    Layoffs in the Prepress Department

      Any layoffs in the Prepress Department shall be in accordance with Article VII(f) of the CBA, and without regard to sector membership.  BATU member seniority will be dovetailed with Guild bargaining unit members within the Prepress Department.  Seniority shall be protected and continuous for any union member on leave to work for the BATU.

V.    As set forth in the "Agreement on Modification of the Addendum to the Collective Bargaining Agreement between the San Francisco Chronicle and the Pacific Media Workers' Guild Local 39521" executed by the parties in 2012 ("Agreement on Modification"), the Employer is no longer required to contribute to the CWA-ITU Negotiated Pension Plan ("Plan"). Pursuant to the Agreement on Modification, the employees identified in Section I above were reclassified as set forth below and their current base pay was increased by the greater of $120.00 per week or the amount necessary to raise the employee's base pay to the corresponding minimum in the then-current collective bargaining agreement between the Employer and the Guild for their new classification, provided, however, that in no case would an employee's base pay be increased by more than $123.43:

HINES, INETTA PEARL    Schedule C, Classification IX, +5 years
SMITH, HEATHER    Schedule C, Classification IX, +5 years
LA RIVA, GLORIA    Schedule C, Classification IX, +3 years
RYAN, JOSEPH    Schedule C, Classification IX, +3 years

SARPIERI, ANNA              Schedule C, Classification IX, +3 years

The parties agreed and continue to agree that the resulting new base pay of each of the foregoing employees was comprised, in part, of the following irreducible amounts: $63.00 per week on account of returned prior wage diversions and $120.00 per week on account of the cessation of contributions to the Plan. Because some of the foregoing employees' base pay may have exceeded the minimum base pay for their respective new classification as a result of the increase of $120.00 per week in their current base pay as provided under the Agreement on Modification, the Employer agrees that the new base pay of the foregoing employees will be subject to any general wage increase agreed to in any successor collective bargaining agreement with the Guild in the same manner as wage increases may be granted to Guild members.

VI.      In the course of the negotiations leading to the Agreement on Modification, a representative of the Guild asserted the existence of another Addendum agreed to and executed by the parties later than February 16, 2006 that would, if in existence, supersede certain positions of the Addendum executed on February 16, 2006. The Employer specifically denied and denies that any such Addendum was agreed to and executed by the parties after February 16, 2006. Nothing in this Agreement is intended to be or will be construed as an admission or concession by either party as to their respective positions as to whether any such later executed Addendum exists and specifically, if such a later executed addendum provided any guarantees as to Termination Incentives for Attrition List employees as provided in Section II of the Addendum.

VII.     This Addendum supersedes in their entirety any prior Addendums to Guild Agreements concerning the BATU and any Agreements modifying such Addendums.


* * * * * * * * *

Agreed and accepted this 24 day of October, 2013.

San Francisco Chronicle, a division of Hearst Communications, Inc.

By: _____
        Jeffrey M. Johnson, Publisher


Pacific Media Workers Guild Union, Local 39521, TNG-CWA, AFL-CIO, CLC

By: _____
        Carl Hall, Executive Officer

**EXHIBIT B**

# Pacific Media Workers Guild

The NewsGuild - Communications Workers of America Local 39521

433 Natoma Street, San Francisco, California 94103,  415.421.6833, Fax 415.421.3751

February 13, 2017

*Sent via US Mail and e-mail*

Renee Peterson
Vice-President, Human Resources
San Francisco Chronicle
901 Mission St.
San Francisco, CA 94103

### Re: Notice and Grievance re Arbitrary Deletion of Member Vacation Balances

Dear Renee:

Thank you for providing the attached document to the Guild via email on January 24, 2017.  You advised us that the document reflects balances of vacation time that were deleted from our members' vacation banks at the close of 2016 payroll.  It appears that at least 124 of our members had some amount of vacation time debited from their accounts and that there was not a corresponding payment to them for the value of that time.

As a follow-up to our letters to you dated September 14, 2016 and October 6, 2016, we restate our objection to this wholesale taking of our members' deferred compensation. The San Francisco Chronicle's action in doing this violates our collective bargaining agreement, long-established past practice and public policy.  Therefore, the Guild serves this notice of grievance pursuant to Article VI on behalf of each and every Guild member who has suffered a deletion of earned and accrued vacation time and for which the Company has not paid each injured Guild member.

This grievance is based, in part, on Article XII – Vacations; Article X – Hours and Overtime; Article XXI – Minimum Salaries; and Article XXIV – Management's Rights.

We see four issues at this point in time:  1) some of our members lost substantial vacation time; 2) some lost a few days of vacation time; 3) some lost fractions of hours and/or days; and 4) management arbitrarily issued a "blackout" period, barring employees from scheduling vacation after November 23, 2016, for the period from Thanksgiving through New Year's Day.

Audrey Cooper Sept. 8, 2016 email: "**No vacation requests will be granted after Nov. 23 for the period between Thanksgiving Day and New Year's Day**, *regardless of your vacation balance*."

As you know, we worked closely with our members to encourage use of vacation time. All of our members intended to use their vacation time as soon as their work schedules allowed. Most of our members exhausted their balances. Those with substantial remaining vacation time, for the most part, are columnists, political writers, sports writers and/or members involved in sales. Employees in these departments are challenged to take vacation due to vacancies in staff, demands of election and post-election coverage, unpredictable calendars for sports post-season and tournament play, and pressure to make year-end goals in sales. Combine that with the Company's unilaterally imposed ban on vacation scheduling, and it became impossible for many of our members to exhaust their vacation balances.

The labor agreement states that "a manager or supervisor in the applicable department" may permit "an Employee to carry over time." (Art. XII (a).) *Upper* management's blanket edict to ban scheduling and taking of vacation effectively eliminated supervisors' discretion, in violation of the contract. The parties intended to retain this discretion precisely to deal with such situations as election coverage, etc., which need to be evaluated case-by-case. Certainly, many of those left on the list you provided should qualify for such exceptions.

Many of our members responded in good faith to Ms. Cooper's Sept. 8 email by checking their balances of unused vacation on the company intranet, and then attempting to schedule such time as best they could before the Nov. 23 deadline. Management provided no straightforward way for anyone to deduce what their balances would be at year-end, forcing employees to seek out someone in payroll to calculate this based on accrual rates and workdays left in 2016. Further, management made no effort to open up time on the schedule for those with large balances and heavy workloads to take time off.

When Guild representative Kathleen Anderson attempted to counsel members in the workplace on the vacation matter, management interfered, escorting Kat off the premises before she could finish her discussions with members at times convenient to them.

Management left it to the individuals to figure out what their accrued time would be as of Dec. 31 and then find some way to schedule precisely that amount of time by Nov. 23 and then find a way to somehow take that amount of vacation time by year-end. In many cases, people simply wrote off part of their accrued earnings rather than attempt the management's complex, time-consuming scheduling system and arbitrary deadlines.

In summary, those members who lost fractions of hours/days or a few hours/days were robbed of time they were accruing in the later part of the year, or were barred from taking after being

approved for "some" vacation time that did not completely exhaust their balances before the ban instituted by management took place at the end of the year.

The collective bargaining agreement does not allow the value of the vacation time to be forfeited, and public policy underscores that vacation time, if granted, is deferred compensation — so once accrued, it must be used or paid out. The California Supreme Court concluded, "vacation pay is not a gratuity or a gift, but is, in effect, additional wages for services performed." *See* Suastez v. Plastic Dress-Up Co., 31 Cal. 3d 775 (1982).

In addition, the collective bargaining agreement does not waive the right of payment for vacation time taken away from the employee by the employer; nor did the Guild waive members' rights to their accrued vacation pay. *See* Labor Code section 227.3.

Our position from the start has been to cooperate with the management by encouraging vacation use, in order to avoid any need to threaten people with cancellation. When management interfered with this, and resorted to arbitrary deadlines and opaque procedures, the result was widespread loss of an important benefit.

The Guild demands either that our members' balances at the end of payroll 2016 be restored or that their vacation time deleted by the Company be paid to them at their current rate of pay.

We request a meeting to resolve this matter. We are available this week excluding Thursday and most of next week. Please call to discuss a mutually agreeable date and time.

Very truly yours,

Carl T. Hall
Executive Officer

Kat Anderson
Administrative Officer

cc:     unit leaders

*2/13/17 3:50 PM*

**EXHIBIT C**

**From:** Kat Anderson [mailto:kanderson@mediaworkers.org]
**Sent:** Monday, April 17, 2017 3:46 PM
**To:** Renee E. Peterson
**Cc:** CARL HALL
**Subject:** Re: Vacation balances - Grievance moved to Notice of Arbitration effective April 11, 2017

Dear Renee,

The Guild has notified the Company of its intent to arbitrate the vacation balance grievance. Article VI of the collective bargaining agreement requires that the parties select an arbitrator, within five days of receipt of notice of arbitration. The time has come to discuss the arbitrator selection.

Please let me know by COB today of the Company's response.

Very truly yours,

Kat

Kathleen "Kat" Stewart Anderson
Administrative Officer/
Local Representative
Pacific Media Workers Guild
433 Natoma Street, 3rd Floor
San Francisco, CA 94103
(415)421-6833
(415) 298-1335 (cell)
kanderson@mediaworkers.org

> On Apr 11, 2017, at 12:13 PM, Kat Anderson <kanderson@mediaworkers.org> wrote:
>
> Dear Renee:
>
> Thank you for replying.
>
> Given the Company response, the Guild hereby notifies of its intent to arbitrate the matter of the San Francisco Chronicle deleting the entire vacation balance of each employee following the end of 2016.
> The Company's action is in violation of the collective bargaining agreement, labor law and public policy.

1

The Guild was timely in bringing its grievance. Damages attach when harm has been done. The Guild was not aware of the extent of the harm done to its members until the Company provided a list of the vacation balances that were deleted. Once the Company disclosed that information, the Guild filed its grievance.

Please contact us to discuss moving forward on this item.

If the Company puts the Guild in a position of having to move to compel arbitration in a court of law, it will seek attorney's fees, penalties and interest, as appropriate.

Very truly yours,

Kat Anderson
Administrative Officer

On Apr 10, 2017, at 10:31 AM, Peterson, Renee <RPeterson@sfchronicle.com> wrote:

Kat - The Chronicle's position remains unchanged, both on the merits and the untimeliness of the grievance.

Renee

Renee Peterson
Vice President, Human Resources
T: 415.777.7712
C: 925.305.8610
rpeterson@sfchronicle.com

On 4/6/17, 11:58 AM, "Kathleen Anderson" <kanderson@mediaworkers.org> wrote:

Dear Renee:

Thank you for meeting with Carl and me about the vacation balances that were deleted. We discussed the item and came up with some possible responses. You said you were going out of town and we asked for a response from "legal."

Do you have some thoughts to share?

Best,

Kat Anderson
Administrative Officer
Pacific Media Workers Guild

**EXHIBIT D**

**H E A R S T**

Aryn Sobo
Counsel

April 19, 2017

**Office of
General Counsel**

**Eve Burton
Senior Vice President
General Counsel**

Catherine A. Bostron
**Corporate Secretary**

Jonathan R. Donnellan
Mark C. Redman
**Vice President
Deputy General Counsel**

Kristina E. Findikyan
Kenan J. Packman
Maureen Walsh Sheehan
Ravi V. Sitwala
Jack Spizz
Debra S. Weaver
**Senior Counsel**

Liddy Barrow
Jennifer D. Bishop
Marianne W. Chow
Andrea Chui
Adam Colón
Travis P. Davis
Carolene S. Eaddy
Carl G. Guida
Audra B. Hart
Diego Ibargüen
Monika Jedrzejowska
Siu Y. Lin
Kate Mayer
Aimee Nisbet
Shira R. Saiger
Eva M. Saketkoo
Evan Saucier
Jennifer Schanes
Aryn Sobo
Jennifer G. Tancredi
Stephen H. Yuhan
**Counsel**

**Via Electronic and First Class Mail**

Mr. Carl Hall
Executive Officer
Pacific Media Workers Guild
433 Natoma Street – Suite 250
San Francisco, CA  94103

Re:    <u>Notice of Arbitration Regarding Vacation Balances</u>

Dear Carl:

We are in receipt of the Guild's Notice of Arbitration regarding the vacation balances of Guild members.  Please be advised that the *Chronicle* does not consent to arbitration of this dispute.  The dispute is not covered by the arbitration provision set forth in Article VI(c) of the collective bargaining agreement but, beyond that, this is precisely the type of frivolous issue the parties agreed would not be arbitrable.  As you described in your March 13, 2009 letter to Calvin Siemer on the interpretation of Article VI(c), the Company "wanted to avoid arbitrating wholly frivolous grievances or grievances that were filed with the intent or in a manner to harass the Company, rather than to vindicate a contractual right."  In the instant matter, the Guild cannot claim to be attempting to "vindicate a contractual right," as the contract *specifically provides* for the action taken by the *Chronicle*.  The permissibility of vacation forfeiture is provided for explicitly in the CBA (*see* Article XII(a)), is permitted under the law, and the Guild has been on notice since mid-2015 of the *Chronicle's* intention to enforce the provision and consented – impliedly if not expressly – to such action.  Moreover, as previously explained, the underlying grievance was untimely.  Therefore, the *Chronicle* does not consent to arbitration.  Thank you.

Very truly yours,

Aryn J. Sobo

cc:    Kathleen Anderson
       Renee Peterson

300 West 57th Street
New York, NY 10019
T 212.649.2070
F 646.280.2070
asobo@hearst.com

**Sheila Sexton**

| | |
|---|---|
| **From:** | Kat Anderson <kanderson@mediaworkers.org> |
| **Sent:** | Wednesday, April 19, 2017 10:16 AM |
| **To:** | Sheila Sexton |
| **Subject:** | SFC - Guild   Fwd: Notice of Arbitration Regarding Vacation Balances |
| **Attachments:** | image001.jpg; Untitled attachment 00124.htm; Cor Hall 4-19-17.PDF; Untitled attachment 00127.htm |

To discuss in due course…..


Begin forwarded message:

**From:** "Sobo, Aryn J" <asobo@hearst.com>
**Subject: Notice of Arbitration Regarding Vacation Balances**
**Date:** April 19, 2017 at 10:05:00 AM PDT
**To:** "Carl Hall (chall@mediaworkers.org)" <chall@mediaworkers.org>
**Cc:** "Peterson, Renee" <RPeterson@sfchronicle.com>, "Kathleen Stewart Anderson (kanderson@mediaworkers.org)" <kanderson@mediaworkers.org>

Carl:

Please see attached correspondence, a hard copy of which is being sent to you by mail.  Thank you.

Aryn

**Aryn J. Sobo**
Counsel

300 West 57th Street
New York, NY 10019
T: +1 212-649-2070
Fax: +1 646-280-2070
asobo@hearst.com

**EXHIBIT E**

**From:** Carl Hall <chall@mediaworkers.org>
**Date:** Monday, September 11, 2017 at 3:22 PM

**To:** "Peterson, Renee" <RPeterson@sfchronicle.com>
**Cc:** Kat Anderson <kanderson@mediaworkers.org>, Margo Brenes
<mbrenes@mediaworkers.org>, Aryn Sobo <asobo@hearst.com>
**Subject:** vacation for on-call employees

Hello Renee — The Chronicle appears to be engaged in a continuing violation of the labor agreement insofar as it is not crediting on-call copy editors with vacation. The labor agreement provides that these individuals accrue all benefits other than certain benefits for termination — language intended to mean severance and subsidies for ongoing health coverage post term.

The Chronicle in another context has asserted that vacation benefits can be canceled at the end of a calendar year to zero out an employee's balance. We differ on this, as you know. However, for the sake of argument, if it is true then this further negates the employer's already nonsensical position that a vacation benefit is a "benefit for termination" of employment

We have confirmed that on-call employees received vacation for as long as anyone here can recall, prior to the unilateral change implemented by the current management at a date unknown to me.

We proposed addressing this in collective bargaining but have gotten no response, and no new bargaining dates are set.

I heard last week from staff on the desk that in fact the vacation benefit is being denied to on-call staff. I understand there are approximately five (5) employees in this situation.

The Guild hereby provides this written notice of grievance in connection with this ongoing violation of the CBA, Art. XXVIII (b) and XII. We file this grievance pursuant to Art VI and request the parties waive the mandatory meeting in 15 days, toll the timeline on notice of arbitration and defer further discussion to the next bargaining session. Alternatively, should the employer wish to arbitrate, we hereby waive all further discussion and move this matter to arbitration.

We are prepared to move to the selection of arbitrators stage now if that is the employer's preference.

Best,

Carl

cc Kat Anderson, Margo Brenes
*******************************
Carl Hall
Executive Officer
Pacific Media Workers Guild
TNG-CWA Local 39521
433 Natoma St. Suite 250
San Francisco, Calif., 94103
415-421-6833
cell 415-298-2265
chall@mediaworkers.org

(b)     Part-time Employees shall be subject to all provisions of this Agreement except as otherwise expressly provided in this Agreement.  A part-time Employee working less than five days per week shall be eligible for holiday pay only when a holiday falls upon the Employee's normally scheduled work day.

(c)     Part-time Employees shall be paid on an hourly basis equivalent to the weekly minimum salary provided for their classification.

(d)     The Employer in its sole discretion shall determine whether an Employee may work part-time, the number of part-time Employees, and scheduling, reductions or increases in the number of hours a part-time Employee may work in any week.

(e)     At the conclusion of maternity/paternity leave, an Employee may request to be placed on part-time status for a period of time and under circumstances, scheduling, and assignment conditions as determined solely by the Employer.

**ARTICLE XVIII   TEMPORARY EMPLOYEES**

(a)     A temporary Employee is one who is hired for a special project or as a substitute for a regular full-time or part-time Employee, in either case not to exceed fifty-two (52) consecutive weeks, provided that such time may be extended by mutual agreement between the Employer and the Guild; provided further, a temporary Employee may be hired by the Employer to fill the job of a person on an authorized leave of absence for the entire period of such leave.  No contributions shall be required to be made by the Employer under Article VIII (Retirement) of this Agreement on behalf of any temporary Employee.  The Employer may also hire 'On-Call' Employees on an as needed basis for longer than fifty-two (52) consecutive weeks who shall be considered temporary Employees, provided, however, that the Employer may not hire more than ten percent (10%) of the staff as On Callers in any classification or department.  The Employer is not required to provide any specific employment opportunities to an On-Call Employee and may terminate the employment of any On-Call Employee at anytime by providing notice to the On-Call Employee with a copy of such notice to the Guild.   Effective upon the signing date of this Amendment, no contributions shall be required to be made by the Employer under Article VIII (Retirement) of this Agreement for any present or new On-Call Employees.

(b)     Temporary Employees, including On-Call Employees, shall be subject to the provisions of this Agreement except as otherwise expressly provided herein.  Temporary Employees, including On-Call Employees, shall not be eligible to receive any severance payments or benefits for layoffs or termination of employment.  Temporary employees in any classification affected by a reduction in force shall be terminated before any regular employees are laid off.

(c)     No temporary Employee, other than a substitute for a part-time Employee, shall receive less than a full day's pay for any work performed.

21

(d)     Any temporary Employee continuously employed who
shall receive full credit for previous continuous time w
benefits.

## ARTICLE XIX     SALESPERSONS

(a)     The Employer shall establish revenue goals for monthl
each advertising sales Employee and shall inform each
goal. If the Employer wishes to adjust an Employee's
period, the Employee will be informed in advance of th
revenue goal. If the Employee disagrees with the rever
determination to his or her director. If the Employee di
decision, the Employee may appeal the decision to the
designee within the advertising department. The decisi
advertising or her designee with respect to the revenue

A sales Employee who fails to achieve revenue goals e
section in (i) three consecutive months or (ii) four mont
period may be subject to discipline up to and including
that a failure to meet goal in any monthly period due to
bankruptcy of an account, production errors that result i
extraordinary business events having a direct impact on
advertising accounts, shall not be counted for the purpo

This Article and the actions taken by the Employer here
grievance and arbitration provisions of this Agreement
Guild and its members.

(b)     The following provisions shall apply to commission-on
retail, display and classified display advertising, both in

5

**EXHIBIT F**

**From:** "Peterson, Renee" <RPeterson@sfchronicle.com>
**Date:** September 12, 2017 at 4:15:18 PM PDT
**To:** Carl Hall <chall@mediaworkers.org>
**Cc:** Kat Anderson <kanderson@mediaworkers.org>, Margo Brenes <mbrenes@mediaworkers.org>, "Sobo, Aryn J" <asobo@hearst.com>, "Peterson, Renee" <RPeterson@sfchronicle.com>
**Subject: Re: vacation for on-call employees**

Carl:

Without addressing the merits of your email or correcting several misstatements it contains at this time, this purported "notice of grievance" is untimely and not valid.  As you well know, the Guild asked for the *Chronicle's* position on this issue back in October 2016, the *Chronicle* provided such position, and then the Guild took no further action.  For it to now seek to grieve the matter *almost a year later* is disingenuous and, frankly, hard to believe.  The issue can be discussed by the parties as part of collective bargaining and hopefully resolved in some fashion, but the grievance mechanism (much less arbitration) is not available to the Guild.


Renee

**Renee Peterson**
Vice President, Human Resources
T: 415.777.7712
C: 925.305.8610
rpeterson@sfchronicle.com